## HUGH HARTMAN BALDWIN, JR. *v.* STATE OF MARYLAND

[No. 992, September Term, 1979.]

*Decided April 15, 1980.*

The cause was argued before GILBERT, C. J., WILNER and COUCH, JJ.

*William F. Sheehan,* with whom were *William N. Eskridge, Jr., Alfred L. Scanlan, John D. Aldock, Richard H. Sothoron, Jr., Stanley J. Klos, Jr.,* and *Shea & Gardner* and

---

* Note: *Certiorari* granted, Court of Appeals of Maryland, July 3, 1980.

*Shipley, Knight, Manzi & Zanecki* on the brief, for appellant.

*Thomas P. Barbera, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Sidney S. Campen, Jr., State's Attorney for Talbot County,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

## — THE LAW —

Judge J. Dudley Digges, writing for a unanimous Court of Appeals, declared that the Federal Wire Interception and Interception of Oral Communications sections (18 U.S.C. §§ 2510-2520 (1976)) of the Omnibus Crime Control and Safe Streets Act of 1968 "sets up a strict procedure that *must* be followed and we will not abide any deviation, no matter how slight, from the prescribed path." (Emphasis in original.) *State v. Siegel,* 266 Md. 256, 274, 292 A.2d 86, 95 (1972), *aff'g* 13 Md. App. 444, 285 A.2d 671 (1971).

Although the above-quoted words of *Siegel* have not been chiseled into granite, we have, in a series of cases, endeavored to impress on the bench and bar that the words mean precisely what they say. *See e.g., Shingleton v. State,* 39 Md. App. 527, 387 A.2d 1134, *cert. denied,* 283 Md. 738 (1978); *Poore v. State,* 39 Md. App. 44, 384 A.2d 103, *cert. denied,* 282 Md. 737 (1978); *Calhoun v. State,* 34 Md. App. 365, 367 A.2d 40 (1977). *See also,* Gilbert, *"A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law,"* 8 U. of Balt. L. Rev. 183 (1979).

We have not deviated in the slightest from *Siegel's* prescribed path. Whenever a pre-interception violation or violation committed during the course of the execution of the interception order, as distinguished from post-interception violations, has occurred, we have directed that the evidence derived from the legally faulty interception be suppressed. Md. Cts. & Jud. Proc. Code Ann. (1980 Rep. Vol.) § 10-405;

*Carter v. State,* 274 Md. 411, 337 A.2d 415 (1975) (construing the federal statute).

The Maryland Wiretapping and Electronic Surveillance Law, Md. Cts. and Jud. Proc. Code Ann. (1980 Rep. Vol.) §§ 10-401 — 10-412 is tailored along the lines of 18 U.S.C. §§ 2510-2520 (1976). The alterations to the federal act that were made by the General Assembly before enacting Md. Cts. and Jud. Proc. Code Ann. (1980 Rep. Vol.) §§ 10-401 through 10-412 into law were obviously designed to afford to the people of Maryland a greater protection than Congress had provided in the Omnibus Crime Control and Safe Streets Act of 1968.[1]

Because the drafters of the Maryland Act so carefully tracked the federal statute, 18 U.S.C. §§ 2510-2520 (1976), we look to court decisions interpreting that legislation for guidance in construing the Maryland statutory language.[2]

The Court of Appeals, in *Spease v. State,* 275 Md. 88, 338 A.2d 284 (1975), *affg* 21 Md. App. 269, 319 A.2d 560 (1974), upheld a conviction based on evidence obtained as a result of a wiretap notwithstanding a post-interception violation of the federal act. This Court, in *Poore v. State, supra,* commenting upon *Spease v. State, supra,* noted that there is a vast difference insofar as the sanction for non-compliance is concerned between pre-interception violations[3] and post-interception violations.[4] The reason that the courts are more tolerant of non-compliance by the State with the post-intercept provision of the law is that those sections of the code, while important to the accused, are not vital to his Fourth Amendment rights. Pre-interception violations, however, conflict with that Constitutional Amendment.

At what point does a violation cease to be one of pre-interception and become that of post-interception? Neither the Court of Appeals nor this Court has heretofore expressly decided that question. Patently, if we apply the

---

1. *See* Gilbert, *supra.*
2. *Ibid.*
3. State v. Siegel, *supra.*
4. Spease v. State, *supra*; Poore v. State, *supra.*

dictionary definition to *pre*-interception violations, then of necessity, the violation must occur *before* the interception has taken place. Similarly, a *post*-interception violation could only occur *after* the interception has been made.

Strict application of the terms pre-interception and post-interception creates a hiatus between the two. What then is the effect of a violation occurring within the gap? Are such violations free of sanction? Manifestly, the answer to the latter question is a resounding NO, else the minimization requirements of both the federal act, 18 U.S.C. § 2518 (5) (1976) and that of the State, Md. Cts. and Jud. Proc. Code Ann. (1980 Rep. Vol.) § 10-408 (e), would be utterly meaningless. *See Scott v. United States,* 436 U.S. 128, 98 S. Ct. 1717, 56 L. Ed. 2d 168 (1978); *Poore v. State, supra,* 39 Md. App. at 71, 384 A.2d at 119.

The tendency to sort all violations of the federal and State wiretap acts into the two categories — *pre-* and *post*-interception — ofttimes leads to a confusion in the terms. Just as square pegs do not fit into round holes, violations of the federal and State wiretap acts, occurring during the hiatus between *pre-* and *post*-interceptions, do not fit into either of these two classifications.

The problem may be eliminated by viewing the wiretap electronic surveillance law, like all Gaul, "divided into three parts." [5]

The first part, known as *the pre-intercept stage,* requires, under *Siegel* and its progeny, strict compliance with the Md. Cts. and Jud. Proc. Code Ann. (1980 Rep. Vol.) §§ 10-401 through 10-412. The second part may be characterized as *the interception or on-going phase,* at which time the law enforcement agency actually conducts the electronic interception of the communication. The second phase also necessitates that there not be the slightest deviation from the letter of the act. The third part is stylistically known as the *post-interception phase.* It dictates what is to be done *after* the interception has been completed. Violation of the

---

5. From Julius Caesar (100-44 B.C.) *De Bello Gallico I,* 1. where it is written "Gallia est omnis divisa in partes tres." (All Gaul is divided into three parts.)

latter does not mandate suppression of the evidence derived from the interception, unless the party whose communication was intercepted can show that he has been prejudiced by the non-compliance with the statute. *Spease v. State, supra; Poore v. State, supra.*[6] Thus, aware of P.I.P. — *i.e., pre*-interception, *interception, and post*-interception — we turn our attention to the instant case.

## — THE FACTS —

During the month of June 1977, Special Agent Connell J. McGeehan of the Federal Drug Enforcement Administration (FDEA) received information from the San Diego, California office of the same federal agency that "a proven reliable Confidential Informant" had advised that a "HUGH BALDWIN, who resides on the Eastern Shore of Maryland was involved in illicit drug distribution . . . between Florida, Maryland, and the District of Columbia." The information received through the informant was that Baldwin owned a glass company and a bar. Both businesses were allegedly used as a cover or front for the distribution of illegal drugs.

Earlier, in August 1976, McGeehan had received information from the Montgomery County Police that Baldwin had purchased from the North Strong Chemical Company, Inc., of Rockville, Maryland, certain chemicals that, while not in themselves proscribed dangerous substances, could be used in the manufacture of Controlled Dangerous Substances (CDS). According to the Montgomery County authorities, Baldwin placed the chemicals in the trunk of his car. Apparently, as a result of radio communication, the Baldwin vehicle was stopped by a member of the Washington, D.C. police department. A check of the operator license and registration established the identity of the person operating the vehicle as Hugh Hartman Baldwin of Chestertown, Kent County, Maryland.

The Baltimore office of the FDEA notified McGeehan in December 1976 that a Hugh Baldwin of the Atlantic Glass Company, 22 Port Street, Easton, Maryland, had ordered a

---

**6.** *See also* Gilbert, *supra.*

five gallon container of phenyl magnesium bromide, a chemical used in the manufacture of CDS. Shortly afterwards, a surveillance of 22 Port Street was undertaken. The five gallons of phenyl magnesium bromide were delivered to the Port Street address by Special Agent Rivera of the FDEA posing, by pre-arrangement, as an employee of a common carrier. Delivery was made to Alfred B. MacKown, Jr.[7]

A continued "stake-out" of the Port Street property was rewarded when Baldwin, the morning of the day after the delivery of the five gallon container, was seen carrying the container and placing it in the trunk of a 1971 Pontiac. Baldwin then drove the vehicle, followed by an agent of FDEA, to a farm house in Queen Anne's County.

On July 22, 1977, McGeehan was advised that Baldwin had purchased chemicals from North Strong Chemical consisting of thirty gallons of benzene, twelve kilograms of piperidine and eighteen kilograms of cyclohexanone, four kilograms of phenyl acetone, all of which are used in the manufacture of CDS. Additional chemicals were purchased in November and December, 1977 and February and March of 1978. The "majority of the chemicals . . . are known . . . to be utilized in the production and/or manufacturing of . . . [CDS]."[8]

Detective Barbara L. King of the Anne Arundel County Police Department learned on March 13, 1978, that one Brenda Head was to receive two to four pounds of phencyclidine (PCP)[9] from a person known as "Speedy." Alfred MacKown was later determined to be "Speedy." Because "Speedy" believed he was being followed the delivery was aborted. Subsequently, on March 16, Head met King and a confidential informant at the Oxbow Inn, which is located on Ritchie Highway. Head entered the vehicle

---

7. Mr. MacKown was subsequently arrested and charged, but he is not involved in this appeal.

8. Quoted from the affidavit in support of an application for the wiretap order that was granted by the Circuit Court for Talbot County on April 13, 1978.

9. Phencyclidine is also known as "Angel Dust."

occupied by King and sold King a quarter pound of PCP for $425. Head had at the time another one pound bag of PCP. The price for three-quarters of a pound was quoted as $1,225. The quarter pound purchased by King, as well as a quantity obtained from Head in a subsequent purchase, was analyzed at the Anne Arundel County Police Department Laboratory and determined to be PCP, a Schedule II CDS. *See* Md. Ann. Code art. 27, § 279(b)d.5.

"Speedy's" address was ascertained to be 22 Port Street, Easton, Maryland. At that address the FDEA officers and the Maryland State Police (MSP) conducted "numerous intermittent stationary and mobile surveillances" [10] during the period of January 17, 1977 — April 3, 1978.

As a result of telephone calls from Head to Atlantic Glass, King's purchase of PCP from Head, the other purchase of PCP from Head, and Head's advising King and another officer that she, Head, could only contact "Speedy" at the shop, together with "Speedy's" address being the same as Atlantic Glass, the police believed the "shop" and Atlantic Glass were one and the same.

The police then, through the State's Attorney of Talbot County sought a wiretap on Atlantic's telephone.[11]

The affidavit averred that "BALDWIN and MACKOWN have set up and have access to a clandestine laboratory used to manufacture ... [CDS]." The affidavit further asserted that a wiretap would enable the police to learn the identities of "persons as yet unknown who are conspiring to violate the ... [CDS] Laws ... as well as those persons ... [who obtain the CDS] for re-distribution to lower echelon persons ... unknown."

The joint affiants [12] stated that from their experience and training they had "probable cause to believe" that Baldwin

---

**10.** Same source as n. 8, *supra.*

**11.** The State's Attorney is the proper person to seek such an order. Md. Cts. and Jud. Proc. Code Ann. (1980 Rep. Vol.) § 10-406; 18 U.S.C. § 2516 (2) (1976); Poore v. State, *supra;* Gilbert, *supra.*

**12.** The co-affiants were: Cpl. George B. Spicer, MSP, Det. James M. Snow and Det. Barbara L. King of the Anne Arundel County Police Dept., and Special Agent McGeehan, FDEA.

and MacKown, Jr., were "conspiring to manufacture and distribute ... [CDS]. ..."

The affidavits asseverated that without a wiretap they would be unable to learn "the identities and/or degree of participation of the 'higher-ups,' and any co-conspirators. ..." The surveillance at Atlantic had failed to reveal the strong chemical odors normally associated with "Clandestine laboratories."

Normal police activity would, the affiants stated, "appear to be unlikely to succeed if tried or to be too dangerous to use. ..." The affidavit recited:

"1. Your co-affiants know from their past experiences, knowledge, and training that a 'blind buy' (an attempt to purchase Controlled Dangerous Substances from a violator without prior introductions being made by anyone) would fail in an attempt to obtain evidence against ALFRED MACKOWN or HUGH HARTMAN BALDWIN JR. or to identify the 'higher-ups' and/or co-conspirators due to statements made by BRENDA HEAD concerning MACKOWN [sic] being paranoid of strangers.

2. Your co-affiants, from past experience and knowledge as stated above, knows [sic] that other associates of ALFRED MACKOWN JR. and HUGH BALDWIN JR. cannot be approached to give information regarding their involvement in trafficking and manufacturing Controlled Dangerous Substances without the danger of them (associates) revealing the existence of the investigation.

3. Were a Search and Seizure Warrant to be obtained for the Atlantic Glass Company, 10 thru 22 Port Street, Easton, Talbot County, Maryland it is unlikely to succeed in showing either MACKOWN'S or BALDWIN'S total involvement in these illegal activities since it is unknown as to when MACKOWN or BALDWIN would be in

possession or [sic] large quantities of Controlled Dangerous Substances. Further, a Search and Seizure Warrant would not identify the source of supply or the location of a clandestine laboratory.

4. Were the Court to only authorize a 'Pen Register' device to be used, it would only allow your co-affiants to know telephone numbers which MACKOWN calls. It would not intercept pertinent conversations or identify the persons to whom MACKOWN or BALDWIN makes arrangements to manufacture, distribute and/or possess Controlled Dangerous Substances.

5. Your co-affiants from past experiences and knowledge, knows [sic] that the various kinds of investigative techniques described above as having tried and failed, appear unlikely to succeed to pinpoint the degree of participation in violations of the Controlled Dangerous Substance Laws by HUGH BALDWIN JR. and ALFRED MACKOWN JR. and the participation of others unknown, since the investigative techniques have produced little or no evidence up to this point despite the many hours spent on them.

6. Your co-affiants from past experience and knowledge know that other traditional methods of investigating have proven to be ineffective to apprehend persons involved in the above mentioned Controlled Dangerous Substance operation since the telephone itself in fact becomes an instrumentality of the crime."

The order authorizing the wiretap was issued, as we have previously observed, on April 13, 1978. The issuing judge found probable cause to believe that the CDS laws of Maryland were being violated; that "normal investigative procedures have been tried and failed, or reasonably appear unlikely to succeed if tried or to be too dangerous[;]" that evidence "leading to the solution of these crimes, [and] to the identity of" others involved cannot otherwise be obtained.

The concluding paragraph of the interception order provided:

"ORDERED that at present, the ... [MSP] shall be required to report to the Court on what progress has been made towards the achievement of the authorized objection and the need for continued interception at a time period and in a manner as designated by the Court."

Whatever was "designated by the Court" is not revealed by the record. Nevertheless, four unsigned "Status Report Record[s]" are in the record of the case. They bear dates of April 24, 1978, May 1, 1978, May 8, 1978, and May 16, 1978.[13]

Because of their bearing on our discussion of the law, we quote the pertinent parts of each of those reports:

"April 24, 1978 — 5:30 p.m.

As the result of investigation conducted, no telephone conversations between ... Baldwin Jr. and ... Mackown [sic] Jr. have occurred or monitored. ... It appears that Baldwin and Mackown [sic] are meeting in person and not using the telephone. ... No calls have been monitored which would lead to the location of a clandestine laboratory. [Of 245 telephone calls that were intercepted, four were 'related conversations.']"

"May 1, 1978 — 5:30 p.m.

The precursors order by Baldwin from the NorthStrong are not at the Chemical Company as yet. ... Once the precursors arrive the investigation should progress. [458 telephone calls were intercepted, 11 were related.]"

"May 8, 1978 — 5:30 p.m.

[S]till no calls have been monitored between ... Baldwin Jr. and ... Mackown [sic] Jr. ...

---

13. The order, while signed on April 13, 1978, was not effective until 10 a.m., April 17, 1978. It continued until "the attainment of the ... objective or in any event," 11:59 p.m., May 16, 1978.

[S]urviellance [sic] has indicated they are meeting in person at the Atlantic Glass Company. . . . [652 telephone calls intercepted, 14 related.]"

"May 16, 1978 — 5:03 P.M.

During the investigation the wire tap was terminated on May 16, 1978 at 3:57 P.M. Some of the related conversations obtained from the wire tap along with other information obtained from surveillances and investigation were used to obtain a Search and Seizure Warrants [sic] for . . . Atlantic Glass . . . and the farm house owned by . . . Mackown [sic] Jr. During the execution of the Search and Seizure Warrant a large quantity of . . . [PCP] was recovered. . . . [874 telephone calls were intercepted, 16 were related.]"

The State's Attorney for Talbot County filed an eight count Criminal Information against Baldwin charging six violations of the CDS laws and two of maintaining a common nuisance. Because of pre-trial publicity the case was removed, on July 28, 1978, to Cecil County.

## — MOTIONS TO SUPPRESS —

Motions to suppress the evidence gained as a result of the wiretap order and the search and seizure warrants were filed on behalf of Baldwin in the circuit court on October 2, 1978.[14] A hearing on the motions was held on October 30, 1978. At that time the hearing judge observed that the movant had not complied with Md. Rule 736. That rule requires that a motion asserting "[a]n unlawful search, seizure, interception of wire or oral communications . . . shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court. . . ." Md. Rules 736 a 3 and 736 b. Failure to abide by the rule constitutes

---

**14.** Before the hearing judge, appellant's counsel referred to the motion as having been filed on September 29, 1978. The docket entries and the clerk's stamp upon the motions, however, indicate the October 2, 1978, date as being correct.

a waiver. Md. Rule 736 a. Yet, the rule, like many other general rules, is not without exception. The "built-in" exception to Rule 736 is the proviso that "the court [may] for good cause shown" excuse compliance with the tenets of Rule 736 and permit the filing of the motion. It is then treated as if it had been timely filed.

Baldwin's counsel acknowledged that the motions were filed after the expiration of the time frame specified in Rule 736 b,[15] but he advised the hearing judge that the State's Attorney for Talbot County knew that the defense was preparing suppression motions and the prosecutor "had indicated . . . that because he was tied up with a trial in Chestertown and had a heavy trial docket besides that," he would like Baldwin's counsel to "extend the courtesy . . . of waiting a period of time before" filing "the motions."

Mr. Campen, the Talbot County State's Attorney, then said to the court:

> "[T]he representations by [Defense] Counsel are correct to the extent that I was involved in a murder trial in the summer that consumed the better part of two months. I think to put it in its proper perspective, Mr. Southoron [Defense counsel] and I have been quite open and candid with each other in terms of all of our dealings. He has had complete access to my files and I think he's been certainly open and candid with the State.
>
> It was a mutual thing, however, in that we realized both, early on, that the suppression matter was going to be of paramount importance in this case. And because of its importance and because of my trial schedule, I agreed not to object to the timeliness of his filing the motions. And he indicated to me that he was going to need time also. And it was by mutual agreement that we were not

---

**15.** Baldwin's counsel entered his appearance in the case on July 24, 1978. *Ergo,* under the rule the motions should have been filed no later than August 23, 1978. They were actually mailed by counsel to the court and the State's Attorney on September 29, 1978, although as we have said, n. 14, *supra,* they were received by the court on October 2, 1978.

going to challenge each other under Rule 736. I agreed not to do that and I would request the Court to consider hearing those motions today because I feel the State and Counsel mutually agreed that we would not raise an issue of the filing time. And I think his statement is correct in that regard."

Following Mr. Campen's remarks the court replied, "Well, of course, you understand if I rule that . . . [Baldwin] waived . . . [his] right to move to suppress, . . . the evidence will come in. . . ." Mr. Campen responded, "I cannot in conscience stand here and ask the Court to do that. . . ." The judge then said, "I don't think you have to ask the Court to do it. I think the Court can do it sua sponte."

After expressing his belief that Baldwin's failure to file the motions within the time prescribed by Rule 736 b constituted a waiver of the right to file such motions, the judge, applying the old saw "[t]he better part of valor is discretion," [16] went on to say that "in the event that the appellate court would disagree with me, I am going to hear the matter as though it . . . [the motions] were timely filed." The court then proceeded to hear the matters conditionally. The same day the court entered an order in which it noted that "[t]he five motions to suppress were not filed until . . . 69 days after the appearance of counsel. No cause at all has been shown for failure to file the motion[s] within the 30 day period therefore the right to move to suppress has been waived and the Court hereby refuses to hear or grant the motions, *Kohr v. State*, [40] Md. App. [92], 388 At. 2d 1242 [(1978)]." [17]

The cautious judge also filed a separate and alternative order on the merits of the respective motions. It is fortunate that he did so because we have an entirely different view of

---

**16.** William Shakespeare 1564-1616, *King Henry IV* (1597-1598) Part I, Act V, Scene IV, Line 120.

**17.** Nevertheless, the judge entered an order immediately following the refusal to hear the motions. The order was that the court would hear the motions so that if an appellate court disagreed with the circuit court's interpretation of Rule 736, the matter would not have to be remanded solely for the purpose of conducting a suppression hearing.

the disposition that should have been made with respect to Rule 736.

We think the court should not have invoked Rule 736 in the case now before us. Contrary to the hearing judge's opinion the "[n]o cause at all has been shown for failure to file the motion[s] within the 30 day period" specified in Rule 736 b, the record, in our view, demonstrates with clarity that there was "good cause shown." We think the agreement between the State's Attorney and Baldwin's counsel was "good cause," and that the hearing judge's refusal to accept it was error. The error, however, is not fatal because, as we have seen, the judge heard and decided the motions notwithstanding his view that they were tardy.

A little over a week after the hearing on the various suppression motions, the judge filed a series of opinions and orders denying the relief sought. The orders of denial are the aorta of this appeal. The hearing judge, in upholding the validity of the wiretap order, wove his way through the maze of allegations upon which both he and the issuing judge determined that there was "probable cause" for the communication interception. A difficulty with that conclusion is that while there was unquestionably "probable cause" for the issuance of a search and seizure warrant, the "probable cause" for the wiretap is not so clear. The facts gathered by the police upon which they built their application for the wiretap order might arguably support the tap in order to ascertain the whereabouts of the "clandestine laboratory." All that is really said on that subject is that a search of the property of Atlantic Glass "would not identify the source of supply or the location of a clandestine laboratory." What the applicants for wiretap meant by the "identity of the source" is not explained. Such language, however, has become "boiler plate" when police are dealing with distributors of CDS. In the instant case they knew the source of supply. Raw chemicals were purchased by Baldwin or someone on his behalf and apparently made into PCP and other CDS by Baldwin. Moreover, the only thing in the application that approaches a foundation for the deduction that there is "a clandestine laboratory" is the observation

that the police "failed to detect any strong chemical odors from the Atlantic Glass Company which are normally produced from Clandestine laboratories."

Similarly, the allusion to "higher ups" seems to us to be no more than sheer speculation, wishful thinking or fantasy. There is not one scintilla of fact in the affidavit that gives rise to a reasonable inference the "higher ups" existed. On the contrary, the thrust of the State's entire case is that Baldwin, a chemist, was the manufacturer of the CDS. At best the allegations with respect to the source of supply and a clandestine laboratory are flimsy.

We need not and do not here decide whether the application for the wire communication interception order set forth adequate "probable cause" because the order was legally infirm for another reason. We do observe, however, that to allow a wiretap or other electronic interception of an oral communication on the strength of a bald assertion of the desire to learn the identity of "higher-ups" is to defy the legislative intent and to render nugatory the provision of the statute that commands a showing of probable cause.

The hearing judge correctly observed that the wiretap order did not comport with the requirements of Md. Cts. and Jud. Proc. Code Ann. (1980 Rep. Vol.) § 10-408 (f).[18] That section provides:

> "Whenever an order authorizing interception is entered pursuant to this subtitle, the order *shall* require reports to be made to the judge who issued the order showing what progress has been made toward achievement of the authorized objective and the need for continued interception. The reports *shall* be made at the intervals the judge requires." (Emphasis supplied.)

The hearing judge found, and we agree, that the issuing judge did not follow the statute with respect to requiring periodical progress reports. All the issuing judge did was to

---

**18.** We have set out above extracts from the "weekly reports" filed in the instant case.

set out "in the language of the State statute" that "the police shall report 'at a time period and in a manner designated by the Court.' "

The statute requires more than a mere superficial compliance in the form of quoting its wording. It means what it says. *The issuing judge shall provide in the order for the interception that the police report to the judge at designated intervals on the progress being made by the police in attaining their objective.*

Section 10-408 (f) was enacted so as to assure the public that notwithstanding the issuance of a wiretap order, its use would be, insofar as possible, controlled by a neutral authority, the issuing judge, and that it would continue no longer than necessary so as to minimize the intrusion into the privacy of others. One obvious reason for the reports is that if the police obtained their objective with the first interception on the first day the order was in effect, there would be no need to continue the interception for another 29 days.

The hearing judge recognized that the State statute [19] "sets up a strict procedure that *must* be followed," but he believed that the deviation from the statute, in the case *sub judice,* was a *post*-interception variance, thus requiring no more than substantial compliance. *Poore v. State, supra.* We have an entirely different point of view.

As we see it, the violation of section 10-408 (f) is not a post-interception deviation, but a violation of an integral part of the second phase of the order, the *intercept stage,* and, therefore, strict compliance with the State statute is mandated. *Carter v. State, supra; State v. Siegel, supra; Poore v. State, supra; Calhoun v. State, supra.* Consequently, the hearing judge erred in holding that the wiretap order was lawful and the evidence derived therefrom admissible. We reverse his holding.

---

**19.** Under the federal statute, reports are not mandated, but the issuing judge may require them. 18 U.S.C. § 2518 (6) (1976).

## — *SEARCH AND SEIZURE WARRANTS* —

### (Atlantic Glass Company)

There yet remains the matter of whether, absent the information obtained through the impermissible use of the wire communication interception, there was enough independent information in the application for the two search warrants to support probable cause for their issuance.

Any fair reading of the affidavit in support of the search and seizure at the premises of Atlantic Glass can lead to but one conclusion, and that is that all the information obtained therein was either directly attributable to the wiretap order or derived therefrom. When the tainted information is peeled from the affidavit in support of the search and seizure at Atlantic Glass, nothing is left that bears any semblance to probable cause in support of the issuance of the warrant.

### (Dwelling and Premises on Route 662)

We treat the search and seizure warrants separately because their foundations, the affidavits in support thereof, were constructed of different materials. The affidavit supporting the search and seizure warrant with regard to the Route 662 property did spell out in detail sufficient data, obtained independently of the wiretap, to support a finding of probable cause on the part of the District Court judge that issued the warrant.

The recitation of facts as contained in the affidavit of Corporal George B. Spicer of the MSP showed Spicer's training and expertise in the field of CDS violations; his having been informed by agents of the FDEA of the suspected illegal activities of Baldwin and MacKown; Baldwin's purchase of quantities of chemicals that were used in manufacturing PCP and other CDS; the delivery of those chemicals to the premises occupied by Atlantic Glass; Baldwin's transporting of the chemicals from Atlantic Glass to the farm house in Kent County, Maryland; a list of nineteen different chemicals together with the quantity of

each and the type, if known, of CDS in which the chemical was used;[20] the purchase of PCP by Detectives Snow and King of the Anne Arundel County Police Department from Barbara Head and Ms. Head's connection with MacKown; Head's telephone calls to MacKown at his "shop" (Atlantic Glass); Baldwin's frequent visitations to Atlantic. That information, coupled with Spicer's experience gave rise to an inference of probable cause to believe that Baldwin was engaged in the manufacture of PCP and other CDS, and that at least part of the operation was being conducted in or around the farm that Spicer wanted to search.

We think the hearing judge was right in ruling that the evidence obtained from a search of the farm was admissible. The admissibility of that evidence, however, does not cure the defect in the proceedings. We must reverse and remand for a new trial because there is no way to determine what effect the illegally obtained evidence had on the minds of the jurors, *vis a vis,* the legally admissible evidence, nor can we determine how the jury sifted, weighed and applied the evidence to the various counts of the indictment.

We do not reach the other issues raised by Baldwin inasmuch as they may not arise at a retrial.

> *Judgments reversed.*
> *Case remanded for a new trial.*
> *Costs to be paid by Talbot County,*
> *Maryland.*

---

**20.** For example, "255 pounds" of "Sodium Hydroxide Pellets" used in "Amphetamine/Phencyclidine"; "1 x 5 gallons," "cyclohexanone," "18 x 1 kilograms" of "piperidine," "4 x 25 Pounds" "sodium bisulfate" all used in PCP.