598 A.2d 495

**James A. STANDIFORD**

v.

**Mary Lee STANDIFORD.**

**No. 1960, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Nov. 27, 1991.

Certiorari Denied Feb. 21, 1992.

James A. Standiford, Millersville, for appellant.

Ronald A. Silkworth, Glen Burnie, for appellee.

Argued before GARRITY, DAVIS and HARRELL, JJ.

HARRELL, Judge.

Appellee, Mary Lee Standiford, brought a civil action against her ex-husband, appellant, James A. Standiford, for invasion of privacy and violation of Md.Cts. & Jud.Proc. Code Ann. § 10–401 *et seq.*, Maryland's Wiretapping and Electronic Surveillance Act. A jury trial was held in the Circuit Court for Anne Arundel County (Goudy, J. presiding), and judgment was entered for appellee in the amount of $12,500 in actual damages, $25,000 in punitive damages, and $9,500 in attorney's fees. Appellant filed a Motion for New Trial which was denied on 29 October 1990. This appeal followed. Appellant raises the following issues:

I. Whether the trial court erred in refusing to grant judgment for appellant on Count I of appellee's Complaint which alleged a violation of Maryland's Wiretapping and Electronic Surveillance Act;

II. Whether the trial court erred in allowing the jury to consider the attorney's fees incurred by appellee;

III. Whether there was sufficient basis for the jury's award of actual damages;

IV. Whether there was sufficient basis for the jury's award of punitive damages;

V.  Whether the trial court erred in allowing the jury to take into the jury room a tape player and the tapes of the recorded telephone conversations that had been received in evidence;  and,

VI.  Whether the trial court erred in denying appellant's Motion for Mistrial.

### Facts

The parties were married on 7 November 1964.  Two children, Dawn and Jamie, were born to the parties thereafter.  The couple began having marital difficulties in February 1984.  They were eventually divorced in 1987.  Prior to their divorce, the parties resided at 216 Twelfth Street in Pasadena, Maryland.  The parties stipulated that during their marriage appellant was the sole subscriber for the telephone service in the marital home and that at all times pertinent to this matter appellant was acting alone.  Appellee alleged that from February 1984 through January 1987 appellant listened to and recorded her telephone conversations that occurred in the marital home.  Appellee testified that she never gave permission for appellant to place any listening devices on the telephone lines.

Appellee first learned that telephone conversations in the house were being intercepted when she and her daughter Dawn were in the basement watching television.  They heard voices coming from somewhere other than the television.  They followed the voices until they eventually found a handset hidden on a crate, under a coat.  The handset was hooked into the telephone lines making it possible to hear telephone conversations.  Appellee confronted appellant, an Anne Arundel County police officer, about the handset and he laughed at her and said "he had his reasons."

On 6 September 1985 appellee, her daughter Dawn, and Dawn's boyfriend Michael Frazier, found a tape recorder, an orange handset, and a timer hidden in the laundry room.  This equipment was set up on a freezer under the steps, out

of sight, and in a dark place. Appellee confronted appellant and, again, he laughed and said he had his reasons.

On 28 September 1985, appellee found a series of cassette tapes in appellant's police vehicle. One of the tapes was marked "9/8" and "don't tell." Another of the tapes was marked "after tap, Betty, 9/19/85."

Several days later, on 3 October 1985, appellee found hidden in the loft of the garage another set of recording devices consisting of a black handset and a Panasonic recorder. At some point in October 1985 appellee also found a cassette recorder, an orange handset, and another timer in the loft. Appellee testified that she listened to the cassette found in the cassette recorder. It contained some telephone conversations she had had with her Aunt. Appellee confronted appellant again. At the time of this confrontation the parties were estranged. Appellant told appellee that he wanted her to sign certain separation papers, which appellee did not want to sign. Appellant then threatened that if appellee would not sign the papers, he would tell the husband of the Aunt about a conversation appellee had with her Aunt concerning an adulterous relationship that her Aunt had engaged in during her marriage. Appellant told appellee that he would ruin the Aunt with this information. Appellee informed her Aunt about the tape recording and ultimately decided not to sign the separation papers. As a result of the threats made by appellant to reveal her infidelity, appellee's Aunt confessed to her husband. Thereafter, appellee's Aunt was divorced from her husband. Appellee felt responsible for her Aunt's divorce and she became distressed over these events.

On 6 November 1985, and again on 10 November 1985, appellee found a handset and a recording device in a freezer in the home. Appellee did not remove the device she found on 10 November, but rather, on 12 November 1985, she called the police. On 4 November 1986 the parties separated. Appellee testified that on 4 January 1987 she found a voice activated recording device, an orange headset, and a tape in a loft in the home. She took this equipment to her

sister's home. Later, appellant confronted appellee and demanded that she return the recording equipment.

## *Discussion*

### I.

██ At trial appellant filed a motion to dismiss the count of the Complaint alleging violation of Maryland's Wiretapping and Electronic Surveillance Act, *supra*, ("the Act"), which the court denied. On appeal, appellant contends that the trial court erred in denying his motion to dismiss. He contends that he is exempted from the civil sanctions provided because the Act was not intended to apply to spousal wiretaps where the spouse intercepting the conversations acts alone to install and utilize the wiretap and is the sole subscriber for the telephone service in the commonly occupied marital abode. In support of this position appellant offers extensive citations to federal and other state decisions. We disagree with him and these authorities, to the extent not distinguished herein, and explain.

Section 10–402 of the Act provides in part:

(a) *Unlawful acts.*—Except as otherwise specifically provided in this subtitle it is unlawful for any person to: (1) Wilfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

One of the clear purposes of the Act is to prevent, in noncriminal situations, the unauthorized interception of conversations where one of the parties has a reasonable expectation of privacy. *Benford v. A.B.C.*, 554 F.Supp. 145 (D.Md. 1982). The Act is an offspring of, and closely parallels, Title III of the Federal Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 [1]. *Mustafa v.*

---

1. 18 U.S.C. § 2511(1) provides in part:

   Except as otherwise specifically provided in this chapter any person who—

*State,* 323 Md. 65, 69, 591 A.2d 481 (1991); *Smith v. State,* 283 Md. 156, 389 A.2d 858 (1978), *aff'd,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); *Adams v. State,* 289 Md. 221, 424 A.2d 344 (1981). Consequently, Maryland courts often turn to the federal courts for guidance in construing the Maryland Act. *See generally Baldwin v. State,* 45 Md.App. 378, 413 A.2d 246 (1980), *aff'd* 289 Md. 635, 426 A.2d 916, *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 144 (1981); *Wood v. State,* 290 Md. 579, 431 A.2d 93 (1981); *Petric v. State,* 66 Md.App. 470, 504 A.2d 1168, *cert. denied,* 479 U.S. 860, 107 S.Ct. 206, 93 L.Ed.2d 136 (1986).

While the Maryland Act is modeled upon the federal act, and extensively tracks its provisions, the General Assembly has made some of the provisions of the Act more restrictive than the federal law. *Mustafa v. State,* 323 Md. 65, 69, 591 A.2d 481 (1991); *Petric v. State,* 66 Md.App. 470, 504 A.2d 1168, *cert. denied,* 479 U.S. 860, 107 S.Ct. 206, 93 L.Ed.2d 136 (1986). For example, 18 U.S.C. § 2511(2)(c) permits an interception when one of the parties to the communication has given prior consent while the Maryland Act requires the prior consent of all the parties to a communication. *State v. McGhee,* 52 Md.App. 238, 447 A.2d 888 (1982). The alterations that were made by the General Assembly before enacting the Maryland Act were obviously designed to afford the people of this State a greater protection than Congress provided in Title III. *Baldwin v. State,* 45 Md. App. 378, 413 A.2d 246 (1980), *aff'd* 289 Md. 635, 426 A.2d 916, *cert. denied,* 454 U.S. 852, 102 S.Ct. 295, 70 L.Ed.2d 144 (1981). We recognize, however, that in construing the

---

(a) willfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communications;

\* \* \* \* \* \*

(c) willfully disclosed, or endeavors to disclose, to any other person the contents of the wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Maryland Act we must ensure that its interpretation does not fall below federal guidelines. *Mustafa v. State*, 323 Md. 65, 69, 591 A.2d 481 (1991); *State v. Bailey*, 289 Md. 143, 422 A.2d 1021 (1980).

The issue before us has not been addressed previously by appellate courts in this State. Nevertheless, we are of the opinion that the case *sub judice* involves nothing more nor less than statutory construction.

> The fundamental task, in such a case, is to discern the objective, goal or purpose of the legislation. In our 'efforts to discover the purpose, aim, or policy we look at the words of the statute ... because what the legislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal.' We also may consider 'other material that fairly bears on the fundamental issue of legislative purpose or goal' so that we may read the language of the legislation in the context within which it was written.

*City of College Park v. Cotter*, 309 Md. 573, 587–88, 525 A.2d 1059 (1987), *quoting Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 525 A.2d 628 (1987).

In the case before us, we find that the statutory language is clear and, therefore, it is unnecessary to examine the legislative history for interpretation. The Maryland statute clearly and unambiguously prohibits all willful interceptions and endeavors to intercept any wire, oral or electronic communication. There is no explicit exception regarding the interception of a spouse's communication.

Appellant relies primarily on *Simpson v. Simpson*, 490 F.2d 803 (5th Cir.1974), for the proposition that the Act includes an implied exception for spouses who intercept the conversations of the other spouse. In *Simpson*, the husband intercepted conversations between his wife and another man. The wife brought a civil action against the husband alleging violation of Title III. The Fifth Circuit Court of Appeals examined the language and the legislative history of Title III and concluded that Congress did not intend to

extend the statute to cases involving persons aggrieved by the personal acts of their spouses since issues of the marital home and domestic conflict are normally left to the states. The Court specifically limited its holding to the facts of the case.

The Fourth Circuit has not followed the line of reasoning set forth in *Simpson.* In *Pritchard v. Pritchard,* 732 F.2d 372 (4th Cir.1984), a husband alleged that his wife intercepted telephone conversations by attaching a wiretapping device to the family phone. Relying on *United States v. Jones,* 542 F.2d 661 (6th Cir.1976) and *Kratz v. Kratz,* 477 F.Supp. 463 (E.D.Pa.1979), the husband argued that Title III prohibited all wiretapping activities other than those expressly authorized. The *Pritchard* Court stated:

In light of the clarity and lack of ambiguity of the statutory language, an analysis of the legislative history would not appear to be necessary. The *Simpson* court and other courts faced with the issue have, however, examined the legislative history in an effort to determine the intent of Congress on the issue of wiretapping between spouses. In *Simpson* the court concluded that its search of legislative materials had been 'long, exhaustive, and inconclusive,' yielding 'no direct indications' that Congress intended for the statute to reach interspousal wiretaps conducted in the marital home although the court had found 'several scattered suggestions that [Congress] was aware that the statute's inclusive language might reach this case.' In *Jones* and *Kratz,* however, an analysis of the legislative history led to the conclusion that the legislative history 'evince[d] a congressional awareness of the widespread use of electronic eavesdropping in domestic relations cases, *and* a congressional intent to prohibit such eavesdropping.' Specific references that are persuasive include the testimony before the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee of Professor Robert Blakey. Blakey, who is recognized as the author of Title III, commented that 'private bugging in this country can be divided into

two broad categories, commercial espionage and marital litigation.'

The *Kratz* court found further indication of congressional intent in comments made during the Hearings on *Invasion of Privacy Before the Subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee.* Senator Long, the chairman of the subcommittee, 'noted that the three major areas in which private electronic surveillance was widespread were "(1) industrial (2) divorce cases, and (3) politics." '

Another explicit acknowledgement of the scope of the statute is found in the comments of Senator Hruska, joined in by Senators Dirksen, Scott and Thurmond that '[a] broad prohibition is imposed on private use of electronic surveillance, particularly in domestic relations and industrial espionage situations.'

*Pritchard,* 732 F.2d at 373–74 (citations omitted).

The Court did not find any express exception for unconsented electronic surveillance between spouses, and it did not find any indication that Congress intended to imply such an exception. The *Pritchard* Court concluded, therefore, that Title III prohibits all wiretapping activities unless specifically excepted.

An examination of the Maryland Act convinces us that the statutory language is equally clear; consequently, it is not necessary for us to examine the legislative history. Had the General Assembly intended an exception for the interception of communications of spouses, it would have specifically provided one, as it did with respect to the use of extension telephones. *See generally,* Md.Cts. & Jud.Proc. Code Ann. § 10–401. Since there is no express exception for nonconsensual electronic surveillance between spouses, nor any indication that the General Assembly intended to imply such an exception, we hold that there is no exception for the interception of communications of spouses and we affirm the trial court's denial of appellant's motion to dismiss.

## II.

■ Appellant next contends that the trial court erred in allowing the jury to consider the issue of appellee's attorneys' fees. Section 10–410(a)(3) of the Act creates an entitlement in a successful plaintiff bringing a civil action under the Act to "a reasonable attorney's fee and other litigation costs reasonably incurred." This issue is not preserved for our review. Pursuant to Maryland Rule 2–517, "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." In the case *sub judice*, appellant failed to object when the bill for the appellee's attorney's fees was offered in evidence.

Appellant also failed to object to the trial court's jury instruction which advised the jury that if it found for Mrs. Standiford it could assess reasonable attorney's fees. Maryland Rule 2–520(e) provides that:

> No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury.

Since appellant failed to object to the instruction given, the issue of attorney's fees is not preserved for appellate review.

## III.

Following the trial, appellant filed a motion for new trial in which he argued that there was no legally sufficient evidence that any of his actions were the proximate cause of the injuries sustained by the appellee or that he violated the Maryland Act. The trial court denied this motion. On appeal, appellant suggests that appellee's injuries were not the result of his actions, but rather, the demise of the

parties' marriage or various other problems. Therefore, his Motion for New Trial should have been granted. Even if appellee's damages were a result of the wiretapping, appellant contends that appellee was entitled only to liquidated damages of $1,000 or, at best, $100 for sixty-five days, pursuant to § 10–410(a) of the Act which provides:

(a) *Civil liability.*—Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this subtitle shall have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use the communications, and be entitled to recover from any person:

(1) Actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(2) Punitive damages; and

(3) A reasonable attorney's fee and other litigation costs reasonably incurred.

We disagree and explain.

■ That a trial court may grant a new trial to any party upon a timely motion and proper grounds is beyond dispute. Md. Rule 2–533. Whether to grant or deny a motion for new trial, however, is a matter addressed to the sound discretion of the trial court. *I.O.A. Leasing Corp. v. Merle Thomas Corp.*, 260 Md. 243, 249, 272 A.2d 1 (1971); *Thodos v. Bland*, 75 Md.App. 700, 706, 542 A.2d 1307 (1988). The exercise of the discretion entrusted to the trial court will not be reviewed on appeal, at least when the trial court has fairly exercised its discretion, and except under the most extraordinary or compelling circumstances. *Thodos*, 75 Md. App. at 706–07, 542 A.2d 1307 and cases cited therein. As a preliminary matter, therefore, our task is to determine whether extraordinary or compelling circumstances exist, or substantial rights have been denied, sufficient to justify our review of the trial court's denial of appellant's motion for new trial.

In granting a new trial, [the Court] does not assume that the verdict is, but that it may be, wrong. It says to the parties, we are strongly apprehensive that the result is not in accordance with the evidence. We think it expedient to submit the case to another jury, and leave it to them to say whether or not our fears are well-founded.... It is settled, then, that the court which tried the cause, may, in a proper case, of which it shall be the judge, set aside the verdict and grant a new trial, under circumstances which at first blush would seem to trench upon the rights of the jury. It can look through the evidence upon which the jury have [sic] passed, and then consider the verdict. It can compare them, and, if the one is clearly irreconcilable with the other, can so pronounce, and order the case to be submitted to another jury.

*Thodos,* 75 Md.App. at 708, 542 A.2d 1307 *quoting Snyder v. Cearfoss,* 186 Md. 360, 368–69, 46 A.2d 607 (1946).

■ Thus, a new trial appropriately may be granted where the verdict is against the evidence or the weight of the evidence. *Thodos,* 75 Md.App. at 708, 542 A.2d 1307. Moreover, a motion for new trial may be granted where it can be seen, upon a consideration of the whole case, that the verdict is inequitable, insufficient, or contrary to the admissions of the parties. *Id.* (citations omitted).

■ In the instant case, the jury's verdict was not against the evidence or the weight of the evidence, and it was neither inequitable, insufficient, nor contrary to the admissions of the parties. Dr. Marshall Belaga, a psychiatrist, testified that appellee had been his patient since 23 December 1988. Originally, Dr. Belaga diagnosed appellee as suffering from major depression; however, this diagnosis was eventually changed to adjustment disorder with depression. Dr. Belaga testified that

one of the things that prompted me to change that diagnosis to adjustment disorder with depression is that the diagnosis of depression assumes a large predisposition on the patient's part, either a genetic predisposition

in terms of the family history, or other physical predispositions. In getting to know Mary Lee [appellee] better, it seemed to me that, in fact, there's very little predisposition on her part for depression and that more of what is causing her symptoms is a reaction to the situation that she's in as she perceives it.

Dr. Belaga further testified that much of what was bothering appellee "had to do with her relationship she felt with her ex-husband. She felt that through the years that she had been victimized by him and that ... she felt unsafe because she felt that no matter what she did she wouldn't be able to get away from his power." According to Dr. Belaga, appellee was afraid to be alone and she felt that her ex-husband knew everything that she was doing. Dr. Belaga concluded:

I think that a large part of her [appellee's] adjustment disorder at this point, and a large part of her need to see me, is a direct result of her fear of the power that her husband has over her, one part of that having to do with the fact that he seems to know a lot about what her life is and that she feels even now, with no particular evidence, that the tap ... the wires are still being tapped on her telephone. This is not uncommon. In my experience in the Navy, one of the things that [I studied] was post-traumatic stress syndrome in military men. The kind of syndrome that she presents is very similar to that, and that is when somebody has a traumatic event that occurs, that they relive that traumatic event over and over again. Sometimes psychotherapy has some results and sometimes, despite anything that you do, the person will remain having residual problems.

In Dr. Belaga's opinion, appellee suffered from chronic post-traumatic stress syndrome, the prognosis for which is poor since, in most cases, patients will continue to have a residual disability.

Based upon Dr. Belaga's testimony, there was sufficient evidence from which the jury could conclude that appellee suffered damages as a result of the wiretapping. Conse-

quently, we hold that the trial judge's exercise of discretion in denying appellant's motion for new trial does not present any extraordinary or compelling circumstances and, therefore, will not be reviewed on appeal.

■ Appellant's argument that appellee was limited to liquidated damages of $1,000 or, at best, damages of $6,500, must also fail. Appellant maintains that appellee presented no testimony that the wiretaps were in place and operating during any period other than 6 September through 10 November 1986, a total of 65 days. He also argues that it is mere speculation to assume that the wiretaps were in operation over a longer period of time. We disagree.

Section 10–410, *supra*, provides for: (a) either actual damages or liquidated damages to be computed at a rate of $100 per day for each day of violation or, (b) $1,000, whichever is higher. The evidence in the instant case established that numerous violations by appellant occurred during the period from February 1984 through January 1987. In fact, although appellant failed to state the exact dates that taps were placed on the telephone line, he did acknowledge setting into place several of the taps. Appellee testified that during the period from February 1984 through the end of October 1985 appellant intimidated her and seemed to know about telephone conversations she had with family and friends. Furthermore, Dr. Belaga's uncontradicted testimony indicated that appellee suffered injury as a result of the wiretaps.

Even had the jury relied on the liquidated damages provision of the statute, there was sufficient evidence to sustain the award. In his Brief, appellant concedes that the wiretaps were in place and operating from 6 September through 10 November 1986, a total of 65 days. However, appellee's evidence indicated that the violations occurred during the period of February 1984 to January 1987. There was sufficient evidence presented from which the jury could have concluded that the violations actually occurred on 125 days during this period and accordingly, awarded appellee

$100 per day, pursuant to § 10–410(a)(1). We conclude that there was sufficient evidence presented at trial from which the jury could have reached its compensatory damages award of $12,500. Since the jury's verdict was not against the evidence or the weight of the evidence, the exercise of the trial court's discretion in denying appellant's Motion for New Trial on this ground will not be reviewed on appeal.

## IV.

██ Appellant argues that the trial court erred in entering judgment on the issue of punitive damages. As with Issue II, *supra*, appellant failed to preserve this issue for appellate review. Md.Rule 2–517. Section 10–410(a)(2) clearly provides that any person whose wire, oral or electronic communications are intercepted is entitled to recover punitive damages. Appellant did not object to the applicability of the Act to the facts of this case. Moreover, the court instructed the jury on the issue of punitive damages as follows:

> Then if you find that [actual damages], you're going to be asked, and how do you find as to punitive damage, if any. And don't get the suggestion ... I don't ... I won't keep repeating this, but I'm not suggesting you find damage just because I'm telling you that the ... this is what you're going to be asked. So don't take any suggestion from me. I'm just telling you what's going to happen. And if you find, if you all have elected to find punitive damage, you will be ... you will recite a number.

> \* \* \* \* \* \*

> If you find the Defendant violated the ... the Statute having to do with the interception of the communication, the Plaintiff may be allowed punitive damage in order to punish the Defendant and also to serve as an example or warning to others. In considering this, if you would have the occasion to do so, you may take into consideration any mitigating or aggravating circumstances in the case.

Since appellant failed to object to the trial court's instruction on the issue of punitive damages, the issue is not before us. Md.Rule 2–520(e).

## V.

During the trial, appellee testified that she found a series of cassette tapes in appellant's police vehicle. The entire series of fourteen tapes was marked as Plaintiff's Exhibit 5, and admitted in evidence without objection. The tapes were never played for the jury during the course of the trial. Various witnesses, however, including the appellant, appellee, and the appellee's Aunt, testified about the content of the conversations that appellant recorded on certain of the cassette tapes. At the conclusion of the trial, the jury was given the series of cassette tapes, as well as the recording devices, to take into the jury room. During deliberation, the jury sent a note to the trial judge asking if it could play the tapes. Without giving notice to the parties, the trial judge answered the jury's note in the affirmative. Appellant contends that the trial court erred (1) in allowing the jury ostensibly to listen to the tapes offered in evidence by appellant because the material recorded on the tapes was not admitted in evidence, and (2) in responding to the jury's note prior to notifying the parties. We disagree with appellant's contention and explain.

Preliminarily, we note that appellant was not a party to the intercepted conversations and has no standing to object to their admission in evidence, if they are otherwise admissible. *Manger v. State*, 214 Md. 71, 77, 133 A.2d 78 (1957). *See also* Md.Cts. & Jud.Proc.Code Ann. § 10–410(a) (only persons whose protected communications have been intercepted, disclosed or used in violation of the Act, have a cause of action against the violator). The issue before us, therefore, is whether the illegally obtained tape recordings are admissible in evidence. Section 10–405 of the Act provides:

Whenever any wire or oral communication has been intercepted, no part of the contents of the communication and

no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of this State, or a political subdivision thereof if the disclosure of that information would be in violation of this subtitle.

Before undertaking to construe § 10–405, it is appropriate that we review the principal canons of statutory construction. To ascertain and effectuate the actual legislative intention in enacting any statute is the cardinal rule of statutory interpretation, the primary source of which is the language of the statute itself. *State v. Intercontinental, Ltd.*, 302 Md. 132, 137, 486 A.2d 174 (1985); *Gray v. Anne Arundel County*, 73 Md.App. 301, 309, 533 A.2d 1325 (1987); *Bridges v. Nicely*, 304 Md. 1, 10, 497 A.2d 142 (1985).

> Thus, where 'there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly.' Furthermore, the statute must be construed considering the context in which the words are used and viewing all pertinent parts, provisions, and sections so as to assure a construction consistent with the entire statute. And, if there is no clear indication to the contrary, a statute must be read so that no part of it is 'rendered surplusage, superfluous, meaningless, or nugatory.' On the other hand, we 'shun a construction of the statute which will lead to absurd consequences,' or 'a proposed statutory interpretation if its consequences are inconsistent with common sense.'

*Ford Motor Land Development v. Comptroller*, 68 Md. App. 342, 346–47, 511 A.2d 578 (1986), *cert. denied*, 307 Md. 596, 516 A.2d 567 (1986) (citations omitted).

> We are not, of course, limited to the words of the statute. We may and often must consider other 'external manifestations' or 'persuasive evidence,' including a bill's title and function paragraphs, amendments that occurred as it

passed through the legislature, its relationship to earlier and subsequent legislation, and other material that fairly bears on the fundamental issue of legislative purpose or goal, which becomes the context within which we read the particular language before us in a given case.

*Kaczorowski v. City of Baltimore,* 309 Md. 505, 515, 525 A.2d 628 (1987). The statute should be given that construction which will effectuate or carry out its purpose or object. *Johnson v. State,* 75 Md.App. 621, 542 A.2d 429 (1988), *cert. denied,* 316 Md. 675, 561 A.2d 215 (1989). In the rare case in which it is apparent to the court that plain, clear, and unambiguous language in the statute does not express or carry out the intent of the legislature, the legislative intent as discerned by the court will prevail over the plain meaning of the words of the statute.

In the case *sub judice,* the words of § 10–405 must be read in the context of the entire Act, including § 10–410, *supra,* which creates a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use wire, oral or electronic communications. Although no explicit mention is made of whether the content of protected, nonconsensual communications may be properly admitted in evidence in a civil action brought pursuant to § 10–410, we hold that such evidence may be introduced in evidence for the narrow purpose of proving a violation of the Act in such a civil action. To hold otherwise might render § 10–410 meaningless because it would necessarily preclude any plaintiff from potentially proving an essential element of the civil cause of action established under the Act, namely, that covered communications were indeed intercepted and recorded.

Moreover, while it probably was not critical to the establishment of appellee's claim (except insofar as the nature of the conversation regarding her Aunt and the effect its disclosure had on the appellee) that the content of the tapes be received in evidence, because appellant admitted his conduct, a less forthcoming violator could conceivably insu-

late himself from civil liability if §§ 10–405 and –410 were not harmonized in the way we interpret them in this case.

■ Even assuming, *arguendo*, that it was not proper for the contents of the tape cassettes to be introduced in evidence, we would conclude that, in the instant case, the trial judge's decision to allow the jury to listen to the tape cassettes was harmless error. The appellate courts of this State will not reverse a lower court judgment for harmless error. Rather, the complaining party must show both prejudice and error. *Harris v. Harris*, 310 Md. 310, 319, 529 A.2d 356 (1987). In civil cases such as the one before us, the burden of demonstrating both error and prejudice is on the complaining party. *Id.*

In the case *sub judice*, the contents of the tape cassettes came into evidence, without objection, through the testimony of various witnesses. Both the appellant and the appellee testified as to the contents of the tapes. Appellee's friend, Betty Klein, and appellee's Aunt also testified as to the contents.[2] Moreover, since the cassettes did not contain recordings of *appellant's* protected communications, he can not show that he was injured or prejudiced by the admission of this evidence. Since he can show neither injury nor prejudice, we hold that any error in the court's decision to allow the jury to listen to the contents of the cassette tapes was harmless error.

■ As for appellant's second contention, we agree that the trial court erred in failing to notify the parties of the jury's communication prior to deciding, off the record, that the jury could listen to the cassette tapes. Maryland Rule 2–521 provides as follows:

---

**2.** Appellee's Aunt listened to a tape, played for her by appellee, on which a telephone conversation between her and appellee was recorded. Betty Klein also had a tape played for her by appellee that contained some of their telephone conversations. Appellee testified that of the fourteen tapes admitted in evidence, these two tapes alone were published and then only to the other persons in the recorded conversations, so that they would understand that their privacy had also been invaded.

(a) **Items Taken to Jury Room.**—Jurors may take notes regarding the evidence and may keep the notes with them when they retire for their deliberation. Unless the court for good cause orders otherwise, the jury may also take exhibits that have been admitted in evidence, except that a deposition may not be taken into the jury room without the agreement of all parties and consent of the court. Written or electronically recorded instructions may be taken into the jury room only with the permission of the court.

(b) **Jury Request to Review Evidence.**—The court, after notice to the parties, may make available to the jury testimony or other evidence requested by it. In order that undue prominence not be given to the evidence requested, the court may also make available additional evidence relating to the same factual issue.

(c) **Communications with Jury.**—The court shall notify the parties of the receipt of any communication from the jury pertaining to the action before responding to the communication. All such communications between the court and the jury shall be on the record in open court or shall be in writing and filed in the action.

This Rule expressly permits the jury to take exhibits and evidence into the jury room and requires notice to the parties of any communication from the jury. The purpose of the Rule is to provide an opportunity for input in designing an appropriate response to questions asked by the jury in order to assure fairness and avoid error. *Smith v. State*, 66 Md.App. 603, 624, 505 A.2d 564 (1986).

The fact that the trial judge did not notify the parties of the jury's communication prior to deciding, off the record, that the jury could listen to the tapes, demonstrates that the trial judge failed to follow the Maryland Rule. Our sole remaining task, therefore, is to determine whether this error was prejudicial.

In the case before us, appellant has failed to demonstrate that the trial judge's error in any way influenced

the outcome of the case. We recognize that appellant is proceeding in proper person before us. Our independent review of the record, however, convinces us that the failure of the trial judge to follow Maryland Rule 2–521 when communicating with the jury, in no way influenced the verdict. Consequently, we hold that the error was harmless. *Harris,* 310 Md. at 319, 529 A.2d 356.

## VI.

Appellant's final contention is that the trial court erred in denying his Motion for Mistrial. He argues that, on numerous occasions, appellee attempted to testify on matters that were extremely prejudicial to appellant. This testimony required the trial judge to strike the testimony and instruct the jury to disregard it. Appellant maintains that the court's failure to grant his Motion for Mistrial is grounds for reversal and a new trial. We disagree.

The decision to grant or to deny a mistrial rests in the sound discretion of the trial judge and, in the absence of proof of abuse of that discretion, the decision will not be disturbed on appeal. *Kelch v. Mass Transit Administration,* 42 Md.App. 291, 297, 400 A.2d 440 (1979), *aff'd* 287 Md. 223, 411 A.2d 449 (1980). Generally, the choice of measures to protect the fair, unprejudiced workings of the trial court's proceedings is left to the discretion of the court, and only in exceptional cases will its choice be reviewed by the appellate courts. *Id., citing Nelson v. Seiler,* 154 Md. 63, 139 A. 564 (1927).

In the case *sub judice,* the trial court sustained appellant's objections to portions of appellee's testimony that contained references to appellant's girlfriend and to an unspecified indictment. The trial judge admonished appellee through counsel to refrain from any further references or blurts. The trial judge also told appellee to "just listen to the question and answer only the question asked."

Following appellee's reference to an indictment, the trial court asked appellant's counsel if he would like the court to

"tell the jury to disregard any evidence that they say with regard to any kind of charges of any kind," but appellant's counsel refused this offer stating "Does it rub it in more or does their memory just let it go? I think whatever damage has been done, it's been done." This was an understandable tactical decision by appellant, made to avoid drawing more of the jury's attention to the objectionable statement. However, the trial judge also instructed the jury not to consider appellee's testimony relating to other actions. The court stated:

> You've heard a lot of comments and evidence in this case about other cases, about other actions. Try only this case. Do not try a divorce case, don't try any other kind of case here. You use all the facts that you've heard ... when I say facts, I mean the ... the evidence ... you use the evidence that you heard as to what went on out there in resolving the facts of this case to see whether or not the elements of this case apply.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> If there was an objection in this case and I sustained the objection, do not speculate on what the answer would have been. Don't even consider the question. I know that happened many times in this case, and that's tough for you to do. But do the best you can to follow that. If there was a ... a objection or ... and/or a Motion to Strike and I said strike it, sometimes I told you disregard, that means just that. If they ... there's a request to strike what somebody said, it means that the jury shouldn't have heard it in the first place. So, I'm telling you to please disregard it, what you heard.

We find that the trial court did not abuse its discretion when it denied appellant's Motion for Mistrial. The trial judge chose to strike the objectionable references, admonish appellee, and instruct the jury to decide only the case before it. The trial judge also offered to instruct the jury specifically to disregard any reference to a criminal action, although appellant's counsel rejected this offer. The trial judge was acting well within the bounds of his discretion in

choosing these measures to protect the fair workings of the proceeding below. Finding no abuse of discretion, we affirm the trial court's denial of appellant's Motion for Mistrial.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT