21 A.3d 181

**Tyrone DAVIS**

v.

**STATE of Maryland.**

**No. 1233, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

June 2, 2011.

274

Randy E. McDonald (McDaniel & Associates PA, on the brief) Washington, DC, for appellant.

Gary E. O'Connor (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: EYLER, JAMES R., HOTTEN and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), J.

Where was the interception? In football, a quarterback, standing on his own ten-yard line, may direct a pass to his wide receiver on the forty-yard line. An intervening defensive back, however, with probable cause to anticipate the pass, may leap up and pull the ball out of the air at the thirty-yard line. In the binary "either-or" world of football, the interception precludes the reception. In the multi-layered world of electronic surveillance, by contrast, the message may be received at its destination even as it is simultaneously intercepted in mid-flight. Our problem on this appeal is to pinpoint the legally significant spot at which an electro-magnetic transmission is effectively converted by the opposing team to its own use. Where, jurisdictionally, does the interception take place? At the ten-yard line, the thirty-yard line, the forty-yard line, or at all three places at once?

On the other hand, does such a question even make sense? May valid analogies be drawn between a tangible actuality such as a football and an intangible concept such as communication? Is intercepting the opposing quarterback's pass at all analogous to aiming a parabolic microphone at him to intercept his signal calling? Analogies, at the very least, will be highly strained.

### Possession With Intent to Distribute

The appellant, Tyrone Davis, was found guilty in the Circuit Court for Montgomery County by Judge Terrance J. McGann, sitting without a jury, of the possession of marijuana with the

intent to distribute. He was sentenced to five years imprisonment. After his pretrial motion to suppress evidence because of an alleged violation of the Maryland Wiretapping and Electronic Surveillance Act had been denied by Judge Michael J. Algeo, the appellant proceeded to trial on an agreed statement of facts, preserving his right to appeal from the denial of his suppression motion.

## A Solitary Contention

The appellant's single contention is that the Montgomery County Police violated Maryland Code, Courts and Judicial Proceedings Article, § 10–408(c)(3) when they "intercepted a phone call made by the appellant in Virginia from a Virginia phone to a Virginia phone line while the call's recipient was in Virginia" and that, as a result, not only the contents of the extraterritorial interception but all derivative evidence flowing therefrom must be suppressed pursuant to § 10–405.

## The Year of Decision: 1967–68

Some brief background is necessary to give context to the contention. In 1967, the United States Supreme Court, in *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040, gave off ominous warnings that state statutes authorizing the investigative use of either wiretapping or electronically enhanced eavesdropping, at least as most of those state statutes then stood, might fail to pass Fourth Amendment muster. The typical state statute, it was strongly suggested, would have difficulty in satisfying, *inter alia*, the Fourth Amendment's probable cause requirement, its particularity requirement, and its minimization requirement. The very length of the routinely authorized eavesdropping or wiretapping, the Supreme Court intimated, might turn a single warrant, in effect, into a series of open-ended general warrants. Within six months of the *Berger* decision, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), confirmed that the Fourth Amendment applies to the seizure of intangible conversation even without the necessity of some physical intrusion into a protected area, as *Katz* overruled in that

regard both *Olmstead v. United States,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), and *Goldman v. United States,* 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942).

Both to effectuate, completely and immediately, the protections that were the concern of *Berger* and *Katz,* but also to preserve wiretapping and electronic eavesdropping as effective law enforcement weapons, when properly constrained, Congress enacted "Title III" of the Omnibus Crime and Safe Streets Acts of 1968, now codified as 18 U.S.C., § 2510–2521. Title III is a comprehensive scheme setting out in meticulous detail the careful steps that must be taken by law enforcement officials before a judge will authorize a wiretap or the use of a "bugging" device. Title III also provided that the use of either technique by state law enforcement would be, *ipso facto,* illegal unless the state in question enacted its own implementing statute, fully satisfying all of Title III's requirements. The implementing state statute could be more protective of citizens' rights than Title III, but it could never be less so. Judge Digges described the new dispensation for the Court of Appeals in *State v. Mayes,* 284 Md. 625, 627–28, 399 A.2d 597 (1979):

> *[T]he Congress insured that a uniform national standard would govern the use of electronic surveillance by including* within Title III's provisions *standards* for the use of wiretaps *that the states,* if they chose to allow their law enforcement officials to undertake such surveillance, *must,* at a minimum, *comply with* but which they may, if they desire, make more restrictive.

(Emphasis supplied).

## Maryland Followed Suit: 1977

By ch. 692, sec. 3, of the Acts of 1977, Maryland enacted an implementing statute, now codified in Courts and Judicial Proceedings Article, §§ 10–401 through 10–414. As Chief Judge Robert Murphy noted in *Mustafa v. State,* 323 Md. 65, 69, 591 A.2d 481 (1991):

*The Maryland Act was modeled on the federal act and closely tracks its provisions;* however, the Maryland legislature has made some of the provisions of the State Act more restrictive than the federal law.

(Emphasis supplied). *See also Wood v. State,* 290 Md. 579, 583, 431 A.2d 93 (1981); *State v. Baldwin,* 289 Md. 635, 641, 426 A.2d 916 (1981); *State v. Bailey,* 289 Md. 143, 151, 422 A.2d 1021 (1980); *Howard v. State,* 51 Md.App. 46, 48–49, 442 A.2d 176 (1982); Richard P. Gilbert, "A Diagnosis, Dissection, and Prognosis of Maryland's New Wiretap and Electronic Surveillance Law," 8 *U. Balt. L.Rev.* 183 (1979).

The Maryland Act followed the federal act, and with two exceptions, is essentially indistinguishable from it. *Bailey,* 289 Md. at 151, 422 A.2d 1021 ("The Maryland 'Wiretapping and Electronic Surveillance' law is an offspring of the Omnibus Crime Control and Safe Streets Act of 1968 . . . commonly called Title III."); *Adams v. State,* 289 Md. 221, 223, 424 A.2d 344 (1981) (the Maryland Act "tracks extensively Title III"); *Mustafa,* 323 Md. at 69, 591 A.2d 481; *Standiford v. Standiford,* 89 Md.App. 326, 333–34, 598 A.2d 495 (1991) ("The Act is an offspring of, and closely parallels, Title III of the Omnibus Crime Control and Safe Streets Act of 1968[.]"). In *Fearnow v. Chesapeake & Potomac Telephone Co. of Md.,* 104 Md.App. 1, 32, 655 A.2d 1 (1995), *rev'd on other grounds,* 342 Md. 363, 676 A.2d 65 (1996), Judge Harrell wrote for this Court:

It is clear through both legislative history and case precedent that *the federal wiretap statute . . . served as the guiding light for the Maryland Act. Therefore, we read the acts in pari materia, so as to obtain the legislative intent of the language.*

(Emphasis supplied; citations omitted).

In *Adams v. State,* 43 Md.App. 528, 535–36, 406 A.2d 637 (1979), *aff'd,* 289 Md. 221, 424 A.2d 344 (1981), Judge Chasanow pointed out the two minor respects in which the Maryland law is more restrictive than its federal counterpart. Under the federal law, an interception will be lawful if either party to a conversation consents to its being overheard and recorded.

In Maryland, by contrast, such an interception is lawful only if both parties give consent. *See Mustafa v. State,* 323 Md. 65, 591 A.2d 481 (1991). The distinction is between one-party consent and two-party consent. The closely related second distinction is that in Maryland one-party consent, as an exception to the general Maryland rule, may be enough for the investigation of certain specially designated crimes. Under Title III, one-party consent will always be sufficient no matter what the crime. In that regard, *Adams,* 43 Md.App. at 537, 406 A.2d 637, observed:

> *Because the federal statute is identical to our own in the critical sections* defining "intercept" and "electronic, mechanical, or other device" ... *we may turn to the federal courts for guidance.*

(Emphasis supplied). In almost every other respect, the two acts essentially track each other.

In *Baldwin v. State,* 45 Md.App. 378, 380, 413 A.2d 246 (1980), *aff'd,* 289 Md. 635, 426 A.2d 916 (1981), Chief Judge Gilbert observed:

> Because the drafters of the Maryland Act so carefully tracked the federal statute ... *we look to court decisions interpreting that legislation for guidance in construing the Maryland statutory language.*

(Emphasis supplied).

Because of the massive similarity between Title III and its Maryland offshoot, the fact that the two statutes are not verbatim clones of each other should not be exaggerated, as the appellant seeks to do in this case. The overriding characteristic is their similarity, not their dissimilarity. Title III is an invaluable aid to the statutory interpretation of the Maryland act, and it is a disservice to suggest otherwise.

### Judge Harrington's Interception Order

On September 8, 2006, Judge Ann S. Harrington in the Circuit Court for Montgomery County signed an order authorizing officers of the Montgomery County Police Department, along with officers of the United States Drug Enforcement

Administration as well as officers of "any other jurisdictions ... working with and under the direction of" the Montgomery County officers, to intercept pertinent outgoing and incoming calls on "cellular telephone 757–358–1554." The order recited that cell phone "is currently being used by Tyrone Davis," the appellant. Although the phone number had originally been subscribed to by the appellant, then listing his address as 1305 Bethel Avenue in Hampton, Virginia, Judge Harrington's order recited that the appellant was then living at 14112 Grand Pre Road in Silver Spring, Maryland. Based upon the information provided by the application for the interception order and its accompanying affidavits, the order further recited:

> The cellular telephone 757–358–1554 is known to be used in Montgomery County, Maryland and therefore, and for this and other reasons set forth in the attached affidavit, the applicants believe *the events being investigated are occurring within the jurisdiction of Montgomery County,* Maryland.

(Emphasis supplied).

Because of the mobility of cellular telephones, Judge Harrington's order conferred wide authority on the officers in the execution of the interception:

> **ORDERED** that the facility from which the described communications are to be intercepted is cellular telephone line **757–358–1554,** which is operated on the equipment and infrastructure maintained by T–Mobile USA. This Order applies not only to telephone number **757–358–1554,** but to any changed telephone number(s) or telephone(s) that are subsequently accessed through the aforementioned international Mobile Subscriber Identity (IMSI) 31026011396000, and also to any subsequent IMSI utilized by the telephone number **757–358–1554[.]**

An apparently exhaustive list of cellular phone service providers—including Sprint/Nextel, Cingular Wireless, Verizon Wireless, and T–Mobile USA—were ordered to provide a wide variety of information in any way connected to cellular phone 757–358–1554 "unlimited geographically." Precise positioning

information with respect to the appellant's cell phone was ordered to be provided "without geographic limit."

**ORDERED** that T–Mobile USA, upon request, produce precise positioning information *without geographic limit,* subscriber listing/billing information, cell detail records including incoming and outgoing caller identification *unlimited geographically,* and cellular site identification *unlimited geographically* for the target number **757–358–1554** for the duration of this order[.]

(Emphasis supplied).

### An *En Route* Interception

It is not disputed that the covert listening post from which the police were monitoring the appellant's cell phone was located somewhere in Montgomery County. The interception now in dispute was made at 11:30 P.M. on September 11, 2006. The call was made by the appellant on cell phone line 757–358–1554. Although the content of the call was relatively inconsequential in terms of the ultimate trial merits of guilt or innocence, it could reasonably be inferred that the appellant, as he made the call, was headed home to Montgomery County after having made a drug pick-up in Miami. In proceeding north from Miami, the appellant's probable location in northern Virginia at the time of the call was established by the following telephonic exchange:

Unidentified Speaker: Oh, man. *You are up in D.C.?*

Mr. Davis: *On my way back there now.*

Unidentified Speaker: Oh. *You ain't pass Richmond and shit?*

Mr. Davis: *Yeah, I'm like, I'm like 30 miles from D.C.*

Unidentified: Oh, man. Shit.

(Emphasis supplied).

The significance of the intercept was that it gave the law enforcement team the probable cause it needed for the warrantless detention and questioning of the appellant as he arrived home in Montgomery County at approximately 12:30

A.M. on September 12, about one hour after the call had been intercepted.

## A Suitcase Full of Derivative Evidence

As otherwise substantively inane as the appellant's phone call to his friend somewhere in Virginia may have been, it gave the investigating interceptors probable cause to believe that he would be arriving in Silver Spring within the hour and would be carrying a load of contraband drugs from Miami. Accordingly, the welcoming committee was on hand as he pulled into his parking space in front of 14112 Grand Pre Road shortly after midnight. Although the search of the appellant himself and of his car yielded nothing, the suitcase being carried by the appellant was found to be packed with high-grade marijuana. That marijuana was central to the State's proof of the appellant's possessory guilt.

That marijuana was the subject matter of the suppression motion before Judge Algeo, as the derivative fruit of the allegedly illegal cellular telephone intercept. Derivative evidence, as surely as direct evidence, is suppressible pursuant to the statutory exclusionary rule of § 10–405. Judge Algeo found that there was no violation of the Maryland Wiretapping and Electronic Surveillance Act and denied the motion to suppress. This appeal is from that finding and ruling.

## A Threshold Issue: A Cell Phone
## Intercept Is Not A Wiretap

In *Miles v. State,* 365 Md. 488, 781 A.2d 787 (2001), Judge Battaglia raised what, at first blush, could be a very intimidating question. It is a question not alluded to by either party. It is that of whether the Maryland Act even applies to the interception of a communication between, as in this case, one cell phone and another. The answer is, "Yes, it does." That answer, however, is by no means an automatic *ipse dixit.* Judge Battaglia posed the issue, 365 Md. at 510, 781 A.2d 787, that was then arguably before the Court of Appeals:

The issue of whether a cellular phone call is protected under the Maryland Wiretapping Statute is a matter of first impression.

It was ultimately unnecessary for the Court of Appeals to decide whether a communication between one cell phone and another would be covered by the Maryland Wiretapping Statute, because one end of the line of communication in that case was anchored to a landline. The defendant, from a cell phone in his car, had called his wife at her land-based phone at home. The link-up between the cellular transmission and the landline was important to the Court's analysis, 365 Md. at 510–11, 781 A.2d 787. Finding that the act applied, the Court went on to consider whether it had been violated.

> Because *we have determined that cellular phone communications with land phones are protected under the Maryland Wiretapping Act,* we must address the existence and extent of any violations of the statute by the Maryland State Police requiring exclusion of the taped cellular phone conversation and any "evidence derived therefrom."

365 Md. at 512, 781 A.2d 787 (emphasis supplied). Because the intercepted communication before us was not necessarily anchored by a landline, the issue of cell phone coverage remains for us one of first impression.

Both the original Title III of 1968 and the original Maryland Wiretapping Act of 1977 were significantly more narrow in their coverage than are the two statutes today. They dealt with traditional wiretapping and with electronic "bugging" and not with the use of cellular phones, a much newer technology that had not yet captured the popular fancy nor overwhelmed the consumer market, as it subsequently has.

Wiretapping is a technique to intercept a message between Phone A, located in a fixed place, and Phone B, also located in a fixed place and connected to Phone A by a wire, a landline, either running through an underground cable or looped from telephone pole to telephone pole. At some place along that wire, the eavesdropper would physically plug in with a listening device or a wire proceeding to a listening device. That

investigative technique does not have anything to do with the use of cell phones. One cannot wiretap unless there is a wire to be tapped. The definition of "wire communication" in § 10–401(1) of the Maryland Act, essentially verbatim with the same definition in federal Title III, states:

(1) "Wire communication" means any aural transfer made in whole or in part through the use of facilities for the transmission of communications *by the aid of wire, cable, or other like connection between the point of origin and the point of reception* (including the use of a connection in a switching station) furnished or operated by any person licensed to engage in providing or operating such facilities for the transmission of communications.

(Emphasis supplied). In that simple linear world, an understanding of the location of the interception point required little more than a knowledge of plane geometry.

The other original prohibition, in both acts, was on the use of miniaturized listening devices or "bugs" that could surreptitiously be hidden in the home, office, car, or pocket of the suspect in order to pick up conversation and transmit it to a nearby listening post. The listening device does not intercept communications. It is simply a "hidden ear" picking up sound in a room or other place. It could pick up the private thoughts, or even the prayers, of a solitary suspect, provided only that those thoughts or prayers were spoken aloud. Analytically, this entire investigative modality should probably be located in some different statute, along perhaps with the use of hidden cameras, rather than in an anti-wiretapping statute. In the immediate excitement of *Katz v. United States* (1967), however, the two techniques were joined together in Title III. Analytically, it is a mesalliance but, for better or for worse, the two investigative partners are now joined together. The Maryland definition in § 10–401(2), again following an indistinguishable definition in Title III, simply states:

(2) "Oral communication" means any conversation or words spoken to or by any person in private conversation.

The action clause of § 10–402(a)(1), again tracking the federal original, simply provides, in pertinent part:

[I]t is unlawful for any person to:

(1) Wilfully intercept . . . any wire or oral communication.

Neither the original Title III nor the original Maryland Wiretapping Act, on the other hand, covered communications between cellular phones. Such expanded coverage would not, indeed, follow until 1986 on the federal side, or until 1988 on the Maryland side. In *Bartnicki v. Vopper*, 532 U.S. 514, 524, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001), Justice Stevens described the time and the substance of the enhanced coverage:

> *As enacted in 1968, Title III did not apply to the monitoring of radio transmissions. In* the Electronic Communications Privacy Act of *1986*, 100 Stat. 1848, however, *Congress enlarged the coverage of Title III* to prohibit the interruption of "electronic" as well as oral and wire communications. *By reason of that amendment,* as well as a 1994 amendment which applied to cordless telephone communications, 100 Stat. 4279, *Title III now applies to the interception of conversations over both cellular and cordless phones.*

(Emphasis supplied).

Maryland followed the federal lead by enacting ch. 607 of the Acts of 1988. To the definitions in § 10–401, which already included "wire communication" and "oral communication," Maryland, again following Title III's example, added as § 10–401(11) a definition of "electronic communication":

> (11)(i) "Electronic communication" means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system.

Whereas § 10–402(a), the operational criminalizing provision, had originally only prohibited the interception of wire and oral communications, it now added, again following Title III's example, "electronic communication" to the protective coverages:

(a) *Unlawful acts.*—Except as otherwise specifically provided in this subtitle *it is unlawful for any person to:*

(1) Wilfully *intercept,* endeavor to intercept, or procure any other person to intercept or endeavor to intercept, *any wire, oral, or electronic communication[.]*

(Emphasis supplied).

It was necessary to add "electronic" to § 10–402(a) because a cellular communication is neither a "wire communication" nor an "oral communication" and, therefore, was not covered by the existing law. Although it did not do so until 1988, § 10–402 now clearly covers communications involving cellular phones.[1] The law, as amended in 1988, therefore covers the present case.

When the whole phenomenon of electronic surveillance was brought under the scrutiny of Title III for the first time in 1986 and then under the scrutiny of the Maryland law for the first time in 1988, it was no mere variation on the familiar theme of wiretapping. It was a totally new and distinct field of coverage with its own unique characteristics and its own procedural demands. There are necessarily variations in how the law applies to intercepts on cellular phones because the underlying physics is dramatically different. One may not take a cell phone which is not on a landline and is not vulnerable to a traditional wiretap and treat it as if it were. One should, therefore, take any opinions that do so and politely throw them out as worthless, if not affirmatively misleading. The interception of cell phone communications is in a class by itself.

### The Location of the Other End
### Of the Line Is Immaterial

The appellant makes much of the fact that when he, northbound through Virginia, made his call at 11:30 P.M., the call was made "to a Virginia phone line while the call's recipient

---

1. For the distinct problem of intercepting communications on cordless telephones, see *McKamey v. Roach,* 55 F.3d 1236 (6th Cir.1995).

was in Virginia." It was, indeed, stipulated that the recipient of the call was in Virginia, "away at college in Virginia," at the time the call from the appellant was made. Such a fact, however, is utterly beside the point. That the call was received in Virginia would not serve in any way to invalidate Judge Harrington's jurisdictional authority. Conversely, had the call been received in Maryland, that would not confer jurisdiction if it were not otherwise present. Neither Title III nor the Maryland Wiretapping and Electronic Eavesdropping Act is concerned, at the authorizing threshold, with whither suspect calls go or whence they come. The legitimacy of the intercept does not depend on whether the incriminating message is on its way to Bogota or to Bethesda. Conversely, the entitlement to intercept is indifferent to whether an inculpatory message is inbound from Macao or from Mt. Airy. In terms of proving guilt, on the other hand, that is an entirely different story.

The critical situs at which an interception occurs may be at either or both of two places: 1) where the suspect phone which is the subject of the interception order is located, regardless of whether that phone is sending a message or receiving a message; and 2) where the police are located as they monitor and hear the intercepted message, to wit, the location of the "listening post." The judge who issues the interception order must have jurisdictional authority over at least one of those two places as well as over the place where the crime has occurred and is to be prosecuted. The other end of the line, on the other hand, wherever it may be, has nothing to do with the issue of jurisdiction. If the appellant were right that the location of the other end of the line had jurisdictional significance, we would dread to contemplate the implications of intercepting a conference call.

### What Does the Modifying Phrase Modify?

■ It is the appellant's contention, however, that, under a more restrictive Maryland law as opposed to the laxer federal law, jurisdictional authority over the situs of the listening post will not suffice to confer jurisdiction over the interception.

The appellant contends that an interception is unauthorized under Maryland law unless the suspect phone itself, at the precise moment of the interception, is physically located within the State of Maryland. You must turn off the listening device, the appellant maintains, as the phone crosses the line.

It is a clever argument, but it hangs on the single four-word modifying phrase, "anywhere within the State." The critical question becomes, "What does that modifying phrase modify?" The appellant insists that it modifies the suspect phone, to wit, "a communication device," that must, at the moment of the interception, be located "anywhere within the State." The counter-interpretation is that it modifies "the interception of communications" that may now, post a critical 1991 amendment, occur "anywhere within the State." Section 10–408(c)(3) reads:

> (3) If an application for an ex parte order is made by the Attorney General, the State Prosecutor, or a State's Attorney, an order issued under paragraph (1) of this subsection may authorize the interception of communications received or sent by a communication device *anywhere within the State* so as to permit the interception of the communications regardless of whether the communication device is physically located within the jurisdiction of the court in which the application was filed at the time of the interception. *The application must allege that the offense being investigated may transpire in the jurisdiction of the court in which the application is filed.*

(Emphasis supplied).

It is the appellant's argument that the phrase "anywhere within the State" modifies "a communication device," the noun phrase that immediately precedes the modifying phrase in question. The only communications that could ever be intercepted, pursuant to that argument, would be "communications received or sent by *a communication device anywhere within the State.*" (Emphasis supplied). A clever suspect who carefully carries his cell phone across a state line before making a call would be forever immune from home-state interception.

A drug courier traveling the I–95 corridor between New York and Washington, passing through four or five states en route, would enjoy similar immunity. Jurisdictional authority over wiretapping and electronic surveillance would be tied to the random physical location of a moving cell phone and not to the broader concept that includes the location of the interception.

The appellant, in urging this interpretation, would have us look at what is now § 10–408(c)(3) in a vacuum. A resolution of the interpretive problem, however, requires us to stand back and look at the design and framework of the Maryland Wiretapping and Electronic Surveillance Act as a whole. That law is divided into fourteen sections: Courts and Judicial Proceedings Article, §§ 10–401 through 10–414. Sections 10–409 through 10–414 need not concern us.[2] Section 10–401 provides 18 pertinent definitions. Section 10–403 deals with the manufacture, possession, and sale of intercepting devices. Section 10–404 concerns the forfeiture of intercepting devices illegally possessed. Section 10–405 is the statutory exclusionary rule for violations of the act.[3] Section 10–406 specifies those officials who may apply for an interception order. Section 10–407 regulates the lawfulness of disclosing the contents of intercepted communications.

The interpretive problem now before us boils down to just two sections of the law. Section 10–402 is the key operational section of the entire Wiretapping and Electronic Surveillance law. It is § 10–402 that makes certain intercepts lawful and other intercepts unlawful. It is § 10–402 that provides the

---

**2.** Section 10–409 deals with post-interception reports being made to the Administrative Office of the Courts. Section 10–410 deals with civil liability for violations of the law. Section 10–411 requires the registration of intercepting devices. Section 10–412 concerns breaking and entering in order to place or to remove an intercepting device. Section 10–413 deals with the special problem of hostage and barricade situations. Section 10–414 criminalizes the act of obstructing, impeding, or preventing a lawful interception.

**3.** The statutory exclusionary rule of § 10–405 is sweepingly broader in its coverage than is the Fourth Amendment's relatively pallid exclusionary rule of *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)

penalty for a violation of the act. Significantly, the ostensibly limiting language being urged upon us by the appellant is not to be found anywhere in § 10–402.

It is § 10–408 that deals 1) in subsection (a) with the required contents of an application for an interception; and 2) in subsection (c) with the authority of a judge to issue an order to intercept. It is quintessentially procedural. Prior to being amended by ch. 285 of the Acts of 1991, subsection (c) denied a judge the authority to order an intercept outside of the judge's county or judicial circuit. All other requirements being satisfied, the judge was entitled to authorize an interception only "within the territorial jurisdiction of the court in which the judge is sitting." Thus, a Baltimore City judge at the request of the Baltimore City State's Attorney, for instance, could not order that phones be tapped in Towson or Annapolis. This sort of thing seems to have been an initial fear.

Particularly in view of the increasing usage of cell phones and with a further appreciation of the statewide anti-crime responsibilities of the Attorney General and the State Prosecutor, however, the purpose of the 1991 amendment was to broaden the authority of a judge to order an intercept anywhere in the State. The Summary of Senate Bill 153, which became ch. 285, stated:

> This bill permits a State's Attorney to obtain an *ex parte* order *authorizing the interception of communications sent or received by mobile telephone anywhere in the state regardless of where the mobile telephone is physically located at the time of interception regardless of the territorial jurisdiction of the court that issues the order.*

(Emphasis supplied).

> The stated Background for Senate Bill 153 was as follows: *Under current law, an ex parte order* (an order granted at the request and for the benefit of one party only without giving notice to the adverse party or providing the adverse party with an opportunity to contest the order) authorizing the interception of wire, oral, or electronic communications

*may be issued only for communications within its territorial jurisdiction of the circuit court in which the application is filed.* Therefore, *to intercept communications on a mobile telephone, a separate order must be obtained from the circuit court in each jurisdiction in which the mobile telephone might be moved.*

*This bill removes the need for obtaining multiple ex parte orders by providing for multijurisdictional wiretap orders from mobile telephones.*

(Emphasis supplied).

Chapter 285 itself, as ultimately enacted, stated that it dealt with "Mobile Telephones" and that it was

FOR the purpose of permitting *the Attorney General, the State Prosecutor, and* any State's Attorney to obtain a court order under certain circumstances that authorizes *the interception of certain mobile telephone communications anywhere within the* ~~territorial jurisdiction of the~~ *State;* and generally relating to wiretapping and mobile telephones.

(Emphasis supplied).

The title further stated that it would achieve that purpose by "repealing and reenacting, with amendments" § 10–408(c). It is clear that the purpose of the amendment, including what is now § 10–408(c)(3), was not to confine a judge's authority to order an intercept to the judge's "territorial jurisdiction" (the county or the judicial circuit) but rather to broaden that authority. Subsection (c) became subsections (c)(1)(2) and (3).

Whereas the predecessor subsection (c) had formerly limited the judge's authority to "the territorial jurisdiction of the court in which the judge is sitting," the new paragraph (c)(1) now embraced two possibilities, covered by new paragraphs (2) and (3).

(c)(1) Upon the application the judge may enter an ex parte order, as requested or as modified, authorizing interception of wire, oral, or electronic communications within the territorial jurisdiction [of the court in which the judge is sitting] PERMITTED UNDER PARAGRAPHS (2) AND

(3) OF THIS SUBSECTION, if the judge determines on the basis of the facts submitted by the applicant that[.]

The new paragraphs (2) and (3) were alternatives that contrasted with each other. Paragraph (2) continued the former territorial limitation of the authorizing judge for the routine ex parte intercept order. Chapter 285, as finally enacted, read:

(2) *EXCEPT AS PROVIDED IN PARAGRAPH (3)* OF THIS SUBSECTION, *AN EX PARTE ORDER* ISSUED UNDER PARAGRAPH (1) OF THIS SUBSECTION *MAY AUTHORIZE THE INTERCEPTION* OF WIRE, ORAL, OR ELECTRONIC COMMUNICATIONS *ONLY WITH-IN THE TERRITORIAL JURISDICTION OF THE COURT IN WHICH THE APPLICATION WAS FILED.*

(Emphasis supplied).

The new paragraph (3) covered the case where the order was sought by the Attorney General, the State Prosecutor, or a State's Attorney and authorized the judge to order an intercept of a "mobile telephone" (now changed to "a communication device") anywhere within the State. Chapter 285 read:

(3) IF AN APPLICATION FOR AN EX PARTE OR-DER IS MADE BY *THE ATTORNEY GENERAL, THE STATE PROSECUTOR, OR* A STATE'S ATTORNEY, AN ORDER ISSUED UNDER PARAGRAPH (1) OF THIS SUBSECTION MAY AUTHORIZE THE INTERCEP-TION OF COMMUNICATIONS RECEIVED OR SENT BY A MOBILE TELEPHONE ANYWHERE WITHIN THE TERRITORIAL JURISDICTION OF THE STATE SO AS TO PERMIT THE INTERCEPTION OF THE COMMUNICATIONS REGARDLESS OF WHETHER THE MOBILE TELEPHONE IS PHYSICALLY LOCAT-ED WITHIN THE JURISDICTION OF THE COURT IN WHICH THE APPLICATION WAS FILED AT THE TIME OF THE INTERCEPTION. *THE APPLICATION MUST ALLEGE THAT THE OFFENSE BEING INVES-TIGATED MAY TRANSPIRE IN THE JURISDICTION*

*OF THE COURT IN WHICH THE APPLICATION IS FILED.*

Paragraph (3), moreover, goes on to recite its liberalizing purpose: "so as to permit the interception of the communications regardless of whether the communication device is physically located within the jurisdiction of the court in which the application was filed at the time of the interception." The suspect does not acquire immunity from the intercept order just by stepping with his cell phone across a county line. That is the purpose of paragraph (3).

Section 10–408 generally, in contrast with § 10–402, deals not with the fundamental legality or illegality of an electronic interception but only with the authority of a particular judge to order an intercept. The inclusion of § 10–408(c)(3) in the law, moreover, was a broadening measure, not a constraining measure. The words "anywhere within the State" do not contrast, as the appellant argues out of context, with "somewhere else without the State." That is an unrelated subject that the amendment of 1991, which created § 10–408(c)(3), was not remotely considering. The contrast is between "anywhere within the State" and "only in the territorial jurisdiction of the court in which the judge is sitting." The entire package of paragraphs (1), (2), and (3) is not dealing with where intercepts themselves are permitted, but only with which Maryland judges, as distinct from other Maryland judges, may authorize them.

In the earlier and simpler world of wiretapping, with caselaw trailing all the way back to *Olmstead v. United States, supra,* in 1928, a focus on the actual location of the phone to be tapped made sense. The phone was tethered by a landline and it could not wander off, let alone cross a boundary line. In the infinitely more fluid world of cellular phone technology, by contrast, the physical location of a cell phone at any given moment is so random as to be meaningless. The instrument itself can easily cross, and even recross, a political border— county, state, or national—in the course of a single conversation. The jurisdictional dilemmas, if the focus were on the

instrument itself, could be kaleidoscopic. We confidently hold that the Maryland General Assembly did not, with its 1991 amendment, intend to create such a jurisdictional phantasmagoria.

Reading all three of § 10–408(c)'s subsections in relation to each other and guided by the legislative history of the 1991 amendment, it is pellucid that subsection (c)(3), properly parsed, says that "an order . . . may authorize the interception *anywhere within the state* of communications received or sent by a communication device."

### The Situs of the Crime As the Jurisdictional Anchor

■ It is the final provision of § 10–408(c)(3), moreover, that supplies the critical jurisdictional anchor.

The application must allege that *the offense being investigated may transpire in the jurisdiction of the court* in which the application is filed.

(Emphasis supplied).

That is the indispensable jurisdictional requirement that Montgomery County satisfied abundantly. The officers who conducted the background investigation were Detective Richard L. Armagost of the Montgomery County Police Department and Special Agent Andrew Lawton of the United States Drug Enforcement Administration. The investigation showed that the appellant, operating out of two residential addresses in Montgomery County, had as his primary co-conspirator Shawn Patrick Kenney of 31 Story Drive in Gaithersburg, Maryland. In the Montgomery County drugs hierarchy, Shawn Kenney was higher on the food chain than the appellant. The appellant, on the other hand, had the contacts that enabled him to bring contraband drugs into the state from both New York City and Miami. Sometimes he would use a courier, but sometimes would make the trip himself. After a shipment came into Maryland, the appellant would regularly transfer the drugs to Shawn Kenney at the Red Rock Café in the Muddy Branch Shopping Center in Gaithersburg.

During July and August of 2006, an interception on the cell phone of Shawn Kenney, also authorized by Judge Harrington, revealed numerous drug-related calls between Shawn Kenney and the appellant on the appellant's cell phone. On several occasions, the appellant discussed impending trips to Miami to pick up drugs. Position location information on the appellant's cell phone furnished to the police by T–Mobile showed that on August 19, 2006, the appellant's cell phone (presumably accompanied by the appellant) started out in Montgomery County, traveled to New York City, and returned to Montgomery County. A subsequent intercepted message between the appellant and Shawn Kenney, just after the New York trip, revealed Kenney asking, "What's been goin' on with you?" and the appellant replying, "Got back from mother fuckin' New York." During this same period of time, the appellant and Shawn Kenney also discussed a possible new source of drugs in Texas.

In terms of jurisdiction, the drug possession and distribution crimes giving rise to this interception primarily took place in Montgomery County, Maryland. The investigation took place almost exclusively in Montgomery County, Maryland. The trial ultimately took place in Montgomery County, Maryland. The jurisdictional authority to order the intercept, therefore, was in Montgomery County, Maryland.

### Where Was the Interception Made?

This brings us back around to the question with which we began this opinion, to wit, where does the interception of a cell phone conversation actually take place? Only then can it be determined whether that intercepting event took place in Montgomery County. Our immediately preceding analysis has shown that the Maryland Wiretapping and Electronic Surveillance law does not have a unique and more restrictive provision with respect to where an interception may be ordered or as to where an interception takes place than does the federal law. With Title III and its interpretive caselaw available to us for guidance, therefore, we may turn to that final

question of where precisely an interception of a cell phone communication takes place.

> Title III, 18 U.S.C. § 2510(4) defines "intercept" to mean the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical, or other device.

Section 10–401(3) of the Maryland law is a verbatim copy of the federal original.

The seminal case on where the physical interception of a telephonic communication takes place is *United States v. Rodriguez*, 968 F.2d 130 (2d Cir.1992). In a trial for conspiracy to violate the narcotics laws, some ninety intercepted telephone messages were received in evidence. The defendants complained that those communications should have been suppressed because the federal judge who ordered the interception was from New York, but many of the intercepted conversations came from four wiretaps placed on phones at the Imperio Café in New Jersey. The challenge was to the jurisdiction of the judge in New York to authorize wiretaps in New Jersey.

> [P]rior to trial *defendants moved to suppress* information obtained through the wiretaps on the Imperio Café telephones, *contending that the orders* purporting to authorize the pen registers and wiretaps *were jurisdictionally defective because they were issued by a federal court in New York, rather than a court in New Jersey, the jurisdiction in which the telephones were located.* ...
>
> . . . .
>
> On appeal, *appellants* other than Rodriguez *contend* principally that they are entitled to a new trial on the ground *that the court orders authorizing the wiretaps* and pen registers *on the New Jersey telephones were jurisdictionally defective* and that the information obtained from the wiretaps should therefore have been suppressed.

*Id.* at 134–35 (emphasis supplied).

All of the monitoring equipment, to wit, the listening post, however, was located in New York. The Second Circuit had no

difficulty in deciding that the place of interception could legitimately be either the place where the phone to be tapped was located or the place where the police were monitoring and listening to the contents.

Though it is plain that Congress intended to expand the scope of Title III to extend its protections to modern forms of communication, there is no indication in the legislative history that it intended to extinguish the principle that *the place where the contents of a wire communication are first to be heard and understood by human ears,* other than those of the parties to the conversation, *is the situs of an interception within the meaning of § 2510(4).*

Further, *where the authorities seek to tap telephones in more than one jurisdiction and to monitor them in a single jurisdiction, there are sound policy reasons for permitting a court in the jurisdiction where all of the captured conversations are to be heard to grant the authorization.* . . . If all of the authorizations are sought from the same court, there is a better chance that unnecessary or unnecessarily long interceptions will be avoided. . . .

In sum, the language of § 2510(4), the legislative history of that section, and the police considerations of Title III all persuade us that for purposes of § 2518(3)'s jurisdictional requirement, *a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard.*

*Id.* at 136 (emphasis supplied).

No less than four other United States Courts of Appeal have spoken unanimously to the same effect. In *United States v. Denman,* 100 F.3d 399, 402 (5th Cir.1996), the contention of the defendants was just as it is in this case.

*The Denmans contend that the wiretap jurisdictionally was defective because it was authorized by a judge outside the judicial district in which the subject telephones were located.* The wiretap order was issued by a judge in the Eastern District of Texas where the calls were monitored

and recorded; the tapped telephones were located in Houston within the Southern District of Texas.

(Emphasis supplied).

The Fifth Circuit followed the Second Circuit and held that the listening post was one of the two places where an interception occurs.

> *We agree with the reasoning of the Second Circuit* and now hold that *interception includes both the location of a tapped telephone and the original listening post,* and that *judges in either jurisdiction have authority under Title III to issue wiretap orders.* As the *Rodriguez* court noted, this interpretation aids an important goal of Title III, to protect privacy interests, by enabling one judge to supervise an investigation that spans more than one judicial district. "If all of the authorizations are sought from the same court, there is a better chance that unnecessary or unnecessarily long interceptions will be avoided."

*Id.* at 403–04 (emphasis supplied).

In *United States v. Tavarez,* 40 F.3d 1136 (10th Cir.1994), the Tenth Circuit was called upon to interpret a jurisdictional requirement of the Oklahoma Security of Communications Act. The Oklahoma provision, like the federal provision of Title III (18 U.S.C. § 2518(3)) and like Maryland's § 10–408(c)(2), confines the judge's authority to approve an interception "within the territorial jurisdiction of the court in which the judge is sitting." The authorizing judge, the applicant district attorney, and the ultimate listening post were in Oklahoma District 21, but the two phones that were being tapped were in Oklahoma District 19. The defendant there made the same argument that is being made here. The Tenth Circuit followed the *Rodriguez* case from the Second Circuit and held that the listening post qualifies as a point of interception.

> Although courts have not previously interpreted this provision of the Oklahoma Act, we note that *our interpretation is in accordance with federal court interpretations of the similarly worded federal statute,* 18 U.S.C. 2518(3). Section

2518(3) authorizes a federal judge to approve the interception of wire communications "within the territorial jurisdiction of the court in which the judge is sitting." The Second Circuit has held that *"for purposes of 2518(3)'s jurisdictional requirement, a communication is intercepted not only where the tapped telephone is located, but also where the contents of the redirected communication are first to be heard."*

> *We hold that the location of an "interception" for purposes of section 176.9(C) includes the place where the intercepted communication is heard.*

*Id.* at 1138 (emphasis supplied; citations and footnote omitted).

Given the inherent unpredictability of whether a mobile cell phone may wander across county lines, state boundaries, and even the national border, the indispensable value of the listening post as a recognized interception point and jurisdictional anchor is self-evident. Two of the cases from the United States Courts of Appeal have dealt specifically with the interception of communications between cell phones.

*United States v. Ramirez,* 112 F.3d 849 (7th Cir.1997), involved the investigation of a drug-related conspiracy that "straddled the border between two states, Wisconsin and Minnesota." *Id.* at 850. A judge in the Western district of Wisconsin authorized the interception of cell phone calls, ultimately from a listening post established in Minnesota. In holding that the interception was lawful regardless of where the cell phone itself was located, the opinion of Chief Judge Richard Posner announced, *"We do not think that the location of the phone affected the legality of the tap,"* *id.* at 852 (emphasis supplied), and then explained why the physical location of a cell phone does not have the significance that the physical location of a landline telephone would have in a traditional wiretapping case.

The legislative history of Title III suggests, unsurprisingly, that "mobile interception device" was intended to carry a broader meaning than the literal one. This history de-

scribes the term as applicable "to both a listening device installed in a vehicle and to a tap placed on a cellular or other telephone instrument installed in a vehicle." ... And *a tap is not placed in the telephone handset itself; it is attached to the telephone line a some distance from the handset. The listening post in this case intercepted transmissions between microwave towers that relayed cellular phone calls,* and so was analogous to a tap affixed to a telephone cable outside the subscriber's premises. *The emphasis in "mobile interception device" falls ... on the mobility of what is intercepted rather than on the irrelevant mobility or stationarity of the device.*

*Id.* at 852–53 (emphasis supplied).

In *United States v. Luong,* 471 F.3d 1107 (9th Cir.2006), an intercept was authorized by a judge in the Northern District of California for a mobile phone with respect to which the area code for the phone, the billing address of the subscriber, and the billing address of the mobile service provider were all located in the Eastern District of California. The application for the intercept, however, had recited that "all of the intercepted conversations would 'first be heard in the Northern District of California' and interception 'will automatically take place in San Francisco, California, regardless of where the telephone calls are placed to or from.'" *Id.* at 1109. The argument of the defendants there paralleled that of the appellant here.

*The appellants argue that interception occurs only where the telephone is based or located, and not where the government sets up a listening post* where it is first able to hear the intercepted conversation. The issue, therefore, is clearly drawn: What constitutes "interception" within the meaning of section 2518(3).

*Id.* at 1109 (emphasis supplied).

The Ninth Circuit followed the other Circuits in holding that the listening post qualifies as an interception point and, therefore, confers jurisdiction to authorize the intercept.

A separate statutory section defines "intercept[ion]" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *This definition does not state where an interception occurs or whether more than one interception point may exist for jurisdictional purposes.*

*The most reasonable interpretation of the statutory definition of interception is that an interception occurs where the tapped phone is located and where law enforcement first overhear the call. We join at least three of our sister circuits in so holding* . . . .

. . . .

The district court accordingly had jurisdiction to authorize the wiretap of Luong's mobile telephone despite the phone's Eastern District area code. *Agent Lee's affidavit explained that all of the intercepted conversations would "first be heard" at a listening post "in San Francisco, California,* regardless of where the telephone calls are placed to or from." *The FBI's listening post in San Francisco, California was within the territorial jurisdiction of California's Northern District. The calls were therefore intercepted within the jurisdiction of the judge of the Northern District of California who authorized the wiretap,* as required by section 2518(3).

*Id.* at 1109–10 (emphasis supplied; citation omitted). *See also Castillo v. Texas,* 761 S.W.2d 495, 505 (Tex.Ct.App.1988) ("An aural acquisition takes place where the telecommunications are heard and recorded."); *Evans v. State,* 252 Ga. 312, 314 S.E.2d 421 (1984).

The ruling of Judge Algeo at the suppression hearing was fully in line with this unbroken phalanx of guiding caselaw:

[W]hen you go back and look at the definition section under 10–401 to ascertain what the definition on "intercept" is . . . *[A]lmost the entire section mirrors the federal statute.*

. . . I realize that we're not operating in federal court here, but I do think *Rodriguez is, indeed, enlightening and*

*instructive* because it does make specific reference ... to the fact that ... *since the definition of "interception" includes "the oral acquisition of the contents of the communication, the interception must also be considered to occur at the place where the redirected contents are first heard."*

... *[I]t's not just where they are made, but it also needs to be considered as to where they are heard.*

(Emphasis supplied).

The decision not to suppress the evidence logically followed:

I think *Rodriguez*, even though it's a federal decision, referencing federal court jurisdiction, it doesn't make that distinction; it just simply says that, "The contents of the communications, *the interception must also be considered to occur at the place where the contents are first heard."*

And for that reason, *the motion will be denied.*

(Emphasis supplied).

In this case, moreover, the effect of the 1991 amendment on Judge Harrington's jurisdictional authority was nugatory. Pursuant to § 10–408(c)(1), the order had to satisfy either (c)(2) or (c)(3). The order in this case satisfied both. The interception was carried out within the "territorial jurisdiction" of the Montgomery County Circuit Court in which it had been filed. *A priori*, the interception was carried out "within the State." Jurisdictionally, it was twice blest.

## Persuasive Authority in Support of Inherent Logic

As comforting as we find the persuasive authority of five United States Courts of Appeal, it serves only to buttress our own independent conclusion based on what has to be the primary jurisdictional anchor when dealing with totally untethered cellular communications. The present case is a perfect illustration of why predicating the legality of an interception on the physical location of the cell phone itself would be exceedingly problematic. The only reason we know that the intercepted call now in issue, Call 27 on Line F, emanated from Virginia is because that fact slipped out, purely coincidentally, in the course of essentially extraneous chatter. But

for that conversational happenstance, the call could have been from anywhere. In this case, the dialogue revealed, inferentially, that the appellant was in Virginia. If jurisdiction to authorize an interception depended on such a gratuitous revelation, how long would it take an adaptive narcotics industry to instruct everyone of its cell phone users to announce or to suggest that the call then in progress was coming from Kansas City or from Katmandu? The location of the phone could be a tenuous thread on which to hang jurisdiction over the intercept.

Once a cell phone connection is actually in progress or after it has been completed, to be sure, current cellular phone technology does permit the police, with the assistance of the phone service provider, to locate the general area in which the phone was situated when the call was made. It does this by determining which radio tower or relay station transmitted a message to or from a particular cell phone. The technique, however, cannot pinpoint a precise location of the phone but can only place it in an approximate area of at least a few square miles. Nor can the technique predict where a phone is until the moment it goes operational. As Judge Sharer thoroughly discussed for this Court in *Wilder v. State*, 191 Md. App. 319, 347–68, 991 A.2d 172 (2010), the use of cellular phone technology as a positioning devise is now regularly being employed by law enforcement. *See also Whiting v. State*, 389 Md. 334, 338, 885 A.2d 785 (2005); *Pantazes v. State*, 141 Md.App. 422, 435, 785 A.2d 865 (2001). This use of the technology as a positioning device, however, has nothing to do with the interception of communications and does not implicate either Title III or the Maryland Wiretapping and Electronic Surveillance Law.

What then should be the appropriate authorizing jurisdiction be when the future location of a mobile phone, at the time of some unplanned future call, is unknown. For the authority to intercept Call # 27 on Line F, to what judge in what state or in what county would the appellant have had the Montgomery County Police apply? The transcript of the suppression hearing reveals that during the time that Judge Harrington's

interception order was operational, some fifty-five calls were monitored going out from or coming into the appellant's cell phone. On how many of those occasions was the appellant's cell phone actually in Montgomery County? We, of course, have no idea. The locations, moreover, could not have been known in advance. How could Judge Harrington have anticipated? The job of predicting might as readily be assigned to augurs scrutinizing entrails. To whom should the Montgomery County Police have applied to cover the endless possibilities?

The appellant argues for a jurisdictional scheme that would be unworkable. In the ethereal world of cellular technology, we must depend, for the lack of a feasible alternative, on the reassuring geographic stability of the police listening post. We may rely on it, unlike a cell phone, to stay where it is expected it to be. Judge Algeo did so rely, and we applaud that reliance.

## Conclusion

To conclude this opinion by answering the metaphorical question with which it began, the interception takes place both at the thirty-yard line (the location of the defensive back) and at the ten-yard line (the location of the quarterback). It does not take place at the forty-yard line (the location of the receiver). As we also admonished, however, the analogy is strained, for it applies only to outgoing calls. For incoming calls, the law remains immutably as we have pronounced it herein, but the direction of the metaphor will have to be reversed.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**